# Commonwealth v. Yale

130

*Michael Mancuso*, for Commonwealth.

*Marshall E. Anders*, for defendant.

ZULICK, *J.*, January 8, 2014—This matter is before the court on defendant Edward Yale's omnibus pretrial motion for relief, and his motion for a bill of particulars. Mr. Yale was arrested by the Pennsylvania State Police on June 20, 2013 and charged with the murder of his wife, Joan Yale. The murder was alleged to have occurred on March 22, 2001 in the Yale home at 22 Mt. Nebo Road, Middle Smithfield Township in this county. Mr. Yale filed a request for a bill of particulars on August 27, 2013. When the Commonwealth did not respond to the request, he filed a motion for relief on September 4, 2013. The matter was listed for hearing together with defendant's motion for discovery on September 24, 2013. At that hearing, the parties resolved the discovery issues, but the motion for bill of particulars was rescheduled to October 21, 2013. After additional motions in limine were filed, a final argument was held on November 22, 2013.

## I. The Bill of Particulars

The defendant has been charged with criminal homicide, 18 Pa.C.S.A. §2501(a) and tampering with evidence, 18 Pa.C.S.A. §4910. Defendant has filed a request for a bill of particulars which is opposed by the Commonwealth. P.R.C.P. 572 provides that when a request for a bill of particulars is filed, "the court may make such order as it deems necessary in the interests of justice." *Id.*

The Pennsylvania Supreme Court has stated that "(a) bill of particulars, an anachronism of past procedural rules, serves a narrow purpose; it is not an appropriate vehicle by which to obtain discovery of the Commonwealth's evidence." *Commonwealth v. Champney*, 832 A.2d 403, 412 (Pa. 2003). The court also stated:

> A bill of particulars is intended to give notice to the accused of the offenses charged in the indictment so that he may prepare a defense, avoid a surprise, or intelligently raise pleas of double jeopardy and the statute of limitations. *Commonwealth v. Simione*, 447 Pa. 473, 291 A.2d 764 (1972); *[Commonwealth v.] Dreibelbis*, 493 Pa. [466,] 472, 426 A.2d [1111,] 1114 [(1981)]. It is not a substitute for discovery and the Commonwealth's evidence is not a proper subject to which a bill of particulars may be directed. *Commonwealth v. Davis*, 470 Pa. 193, 368 A.2d 260 (1977); *Dreibelbis*, 493 Pa. at 472-73, 426 A.2d at 1114. *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630, 641 (1991).

*Champney*, 832 A.2d at 412-413.

Defendant requests specific information from the Commonwealth, including the number of blows to the decedent, the instrumentality used to inflict blunt force trauma, a description of the evidence tampered with and what was done with it.

The Commonwealth responds that the defense request for the bill of particulars is in reality a request for discovery, which has been provided to the defendant. It points to the autopsy report and photographs, photographs of the scene, the expert report of Dr. Margaret Hamel and the state police death investigation report which have been provided to the defense. Also the defendant has been provided transcripts of grand jury testimony of witnesses who will be called at trial.

Dr. Hamel's report gives an in depth description of the injuries sustained by Mrs. Yale that caused her death:

> The triad of injuries seen in this case (facial abrasions, comminuted fractures of the facial bones, and fractures of the structures of the neck) are consistent with stomping injuries, or the repeated application of force while the victim is on the ground. Stomping injuries are characterized by abrasions of the side of the head that is in contact with the floor and fractures of the bones of the opposite side of the face. Examination of Mrs. Yale's autopsy report and photographs reveals multiple near-parallel linear abrasions radiating from the right corner of her mouth that extend onto her right cheek with lacerations of the right side of the mouth. These findings are consistent with the repeated downward application of force, which drags the right cheek against a hard object and forcibly tears the soft tissue of the face, creating lacerations. Coupled with the palpable fractures of her comminuted left zygomatic arch and blown-out orbital bone, a likely explanation for these injuries is stomping.

Report of Marianne Hamel, M.D., Ph.D., page 2-3, Commonwealth Exhibit 3.

Dr. Hamel also stated that:

While it is possible to explain these injuries by a head-over-heels tumble down the stairs in which the decedent struck her head multiple times, investigation of the scene does not support such a conclusion. No blood, blood spatter, tissue, or hair was found on the stairs or handrails, a situation wholly inconsistent with head wounds known to bleed copiously.

*Id.* at 2.

The information sought by the defendant in the request for bill of particulars about the blunt trauma allegedly inflicted upon the decedent has been adequately addressed in the discovery materials provided to the defendant. *See Champney, supra,* at 413.

The same is true of the defense request for further information on tampering with evidence. The information states that "the defendant physically assaulted the victim, Joan Yale, repeatedly striking the victim, fracturing her skull and other body parts, causing her death. Thereafter the defendant staged the scene of his attack in an effort to blame the victim's injuries on an accidental fall." Information filed July 24, 2013. The Commonwealth has provided photographs of the decedent's body and the scene to the defendant. In its brief the Commonwealth states that the photographs "show objects that appear to have been moved subsequent to the assault on the victim. These objects may include, but are not limited to, the position of the victim's body, and objects around the victim." Commonwealth brief, page 4.

The defense request for a bill of particulars will be denied.

## II. Defendant's Omnibus Pretrial Motion

Defendant's omnibus pretrial motion was filed on

September 24, 2013. A hearing was held on that motion and on the request for bill of particulars on October 21, 2013. Following the hearing, counsel requested a transcript and were directed to file briefs after the notes of testimony were transcribed.

Mr. Yale raised four issues in his omnibus pretrial motion. Two of those requests, for production of grand jury testimony and expert reports are moot. An order has issued regarding production of grand jury transcripts, and the Commonwealth has provided expert reports, including the report of the forensic pathologist, Marguerite DeWitt, M.D. of her examination of Joan Yale's body, and the report of Marianne Hamel, M.D. Ph.D. discussed above.

The remaining two requests raised in the omnibus motion include a request for the suppression of a statement made by Edward Yale to the Pennsylvania State Police at Mr. Yale's home on June 21, 2012, and the exclusion of statements and writings by the decedent, Joan Yale on hearsay grounds.

A. Suppression of the June 21, 2012 interview of Edward Yale

I make the following findings of fact from the evidence presented during the October 21, 2013 suppression hearing held in this matter.

1. Troopers Robert Sebastianelli and William Skotleski, in civilian clothing, went to the residence of Edward Yale in Bangor on June 21, 2012 at approximately 1:00 p.m. They wished to interview the defendant and to serve a subpoena upon him requiring him to appear before a grand jury. NT 6, 8.

2. The troopers were armed, carrying their handguns under their jackets. NT 8.

3. The troopers knocked on the door of the Yale residence and were met at the door by the defendant. His wife was present as well.

4. The troopers asked if they could talk to Mr. Yale. He said "Sure, come on in." Once inside, the troopers told Mr. Yale that they wanted to talk to him about the death of his former wife, Joan Yale. The defendant again invited them in.

5. The troopers noted that Mrs. Yale was present, and asked the defendant if he would speak to them at the Belfast police barracks. Mr. Yale declined to leave his house, but said "we can talk here."

6. Mr. Yale led the troopers to his kitchen table, where all three sat down. The trooper sat on one side of the table and Mr. Yale sat on the other, closest to the door. NT 36. His wife went to another room in the house. NT 25. The troopers again told the defendant that they wished to talk about the death of Joan Yale, and Mr. Yale again said "okay, sure." NT 7.

7. The troopers did not place the defendant under arrest.

8. The troopers did not read Mr. Yale Miranda warnings.

9. The troopers conducted the interview in a conversational tone and it lasted for approximately one hour and forty minutes. During that time, Mr. Yale excused himself from the kitchen table on two occasions, once to go to the bathroom, and again to answer a telephone call. NT 9.

10. At the conclusion of the interview, the troopers handed Mr. Yale a grand jury subpoena.

11. Mr. Yale was aware the troopers were armed when they came to his house. NT 26.

12. Mr. Yale is a former police chief and told the troopers that during the interview. NT 30.

13. The troopers did not order Mr. Yale to remain at the table during the interview. NT 34.

14. At times during the interview, Mr. Yale became emotional and at times he expressed anger while responding to the troopers' questions. NT 35.

15. Although Mr. Yale testified that he was suffering from the presence of kidney stones at the time of the interview, and taking medication that made him groggy, he did not tell the troopers that he was ill or taking medication. NT 29, 33.

16. The troopers did not notice that he was under the influence of medication and his answers to their questions were coherent. NT 33.

17. At the end of the interview, Trooper Sebastianelli asked Mr. Yale if he would answer questions at a later time and he agreed to do that.

## DISCUSSION

The defendant contends here that his statements to the troopers during the interview should be suppressed as the product of a custodial interrogation with no Miranda warnings given beforehand. The Pennsylvania Superior Court reviewed the law relating to the giving of Miranda warnings in *Commonwealth v. Levanduski*, 907 A.2d 3, 23-24 (Pa. Super. 2006):

Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of Miranda rights. *Commonwealth v. DiStefano*, 782 A.2d 574, 579 (Pa. Super. 2001), *appeal denied*, 569 Pa. 716, 806 A.2d 858 (2002).

Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda, supra* at 444, 86 S.Ct at 1612, 16 L.Ed.2d at 706.

Whether a person is in custody for Miranda purposes depends on whether the person is physically [deprived] of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted. *Commonwealth v. Williams*, 539 Pa. 61, 74, 650 A.2d 420, 427 (1994) (internal citations omitted).

Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.

The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. The fact that a police investigation has focused on a particular

individual does not automatically trigger "custody," thus requiring Miranda warnings. *Commonwealth v. Mannion*, 725 A.2d 196, 200 (Pa. Super. 1999) *(en banc)* (internal citations omitted). *See also Commonwealth v. Peters*, 434 Pa. Super. 268, 642 A.2d 1126, 1130 (1994) *(en banc)*, *appeal denied*, 538 Pa. 668, 649 A.2d 670 (1994) (stating fact that defendant was focus of investigation is relevant for custody determination but does not per se require Miranda warnings). Whether a person is in custody for Miranda purposes must be evaluated on case-by-case basis with due regard for the facts involved. *Mannion, supra* at 202.

*Id.*

Reviewing these factors supports the conclusion that the interview was not a custodial interrogation. First, the interview was conducted after Mr. Yale allowed the troopers to come into his home. This was not a "detention." A person is "in custody" for Miranda purposes when "he is physically denied his freedom of action in a significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." *Commonwealth v. Williams*, 650 A.2d 420, 427 (Pa. 1994).

Although Mr. Yale testified that he believed his freedom of movement was restricted by the troopers during the interview, the facts are otherwise. The interview was conducted in Mr. Yale's home, after he allowed the troopers in. He was unwilling to accompany the troopers away from his house, but chose to talk to the troopers there. The defendant got up twice during the interview, to go to the bathroom and to answer a telephone call. He was not limited by the troopers in leaving the room for these purposes. The length of the interview was not onerous. The interview began between 1:00 p.m. and 1:15 p.m.

and ended at 2:40 p.m. During that time, Mr. Yale left the room twice of his own volition.

The location was in Mr. Yale's home; although the troopers requested that they go to the police barracks "for more privacy," Mr. Yale was able to decline that invitation and invited the troopers into his home. He was sitting closest to the door and was not hemmed in at the kitchen table.

No restraint was used by the police to limit Mr. Yale's freedom of movement. The troopers were armed and Mr. Yale was aware of that. However, the weapons were concealed under the troopers' clothing and were never drawn or used in an intimidating manner toward Mr. Yale, who had formerly been a police officer himself.

Although Mr. Yale became emotional and at times angry during the interview by the police, there was no credible evidence of loud, threatening or overbearing behavior by the police officers during the interaction. Mr. Yale testified that they told him "not to go anyplace," but beyond this conclusory statement, he did not explain how he was able to leave to go to the bathroom or to take a telephone call.

Mr. Yale was clearly the focus of the police investigation at the time of the interview, but this alone does not require the provision of Miranda warnings. *Commonwealth v. Peters, supra*. The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring Miranda warnings. *Commonwealth v. Fento*, 526 A.2d 784, 787 (Pa. Super. 1987); *Commonwealth v. Baker* 24 A.3d 1006, 1020 (Pa. Super. 2011).

Mr. Yale's request to suppress his statements made during the June 21, 2012 interview will be denied.

## B. Defendant's Motion in limine to Prevent Introduction of Statements and Writings of Joan Yale

The defendant has filed a motion in limine to preclude the introduction of statements and writings of Joan Yale. The Commonwealth intends to call Joan Yale's two sons, her two daughters-in-law, her brother, her sister-in-law and a former neighbor, to testify at least in part to statements made by Joan Yale to them over the years, up to and including the time shortly before she died. The following statements made by the decedent are representative of the proposed testimony;

> Edward Yale called Joan derogatory names and mentally abused her. Yale threw things around the house when he became upset. Yale and Joan argued about Joan's reluctance to title the house in their joint names because Yale had paid for an addition to be placed upon the house. Joan called (the witness) every day before her death to say "Ed is acting up again." Com. Brief, Exhibit A. In the week before her death, Joan told the witness that "Ed would not let her use the cars or give her any money." *Id.* Joan told the witness that the marriage was "nothing more than a marriage of convenience and there was no love involved." *Id.* Joan was considering divorce. Joan had two cds and Yale was "always bothering (her) about putting Yale's name on the cds but (Joan) refused." *Id.* Joan took the witness through her house and pointed at different possessions and said "if something happens to me, so and so should get this" referring to her grandchildren, *Id.* She also said that Ronnie and Raymond should get the house because their father built the house, *Id.*

The Commonwealth proposes to introduce these and other statements from Joan to family members

detailing her relationship with Yale. Com. Exhibits A-E. The Commonwealth also intends to introduce a written statement obtained from Joan Yale's purse after her demise. In the note, Joan Yale "details problems in the relationship with the defendant including the names that he would call her." Com. Brief, page 2, Exhibit H.

These statements are relevant to show that a poor relationship existed between the Yales at the time of Joan's death and that it was replete with unpleasant, aggressive and controlling behavior by the defendant and involved quarrels and bitter arguments over money and property. The Commonwealth contends that evidence of this behavior by Yale will be proof of his motive and intent to kill his wife.

To establish the offense of first-degree murder, the Commonwealth must prove the fact of the killing, the defendant's involvement, and malice and specific intent to kill on the part of the defendant. *Commonwealth v. Collins*, 550 Pa. 46, 50, 703 A.2d 418, 420 (1997).

The Commonwealth proposes to introduce many statements made by Joan to her family members about her relationship with Yale and issues arising between them. Although it is impossible to categorize each statement from each of many witnesses, without examining them one at a time, in general, they constitute hearsay. The Pennsylvania Rules of Evidence define a "statement" as "(1) an oral or written assertion (2) nonverbal conduct of a person if it is intended by the person as an assertion." P.R.E. 801(a). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." P.R.E. 801(c).

The Commonwealth contends that these statements are

admissible because they are offered to establish Joan Yale's state of mind. It should be noted that a declarant's state of mind may be proven by circumstantial evidence that is not hearsay. For instance, if Joan Yale's statement were "I am the Queen of England" and the relevant question was whether she was in her right mind, that statement would be admissible and would not be hearsay because it would not be offered for the truth of the statement. It would show that she was not thinking properly. If her statement were "I am afraid of Edward Yale" then the statement would be hearsay, because it is an out of court statement offered to prove the truth of the statement, that she was afraid of her husband. An exception would have to apply for that to be allowed as evidence.

The Commonwealth contends that the statements of Joan Yale which it wishes to introduce are admissible pursuant to Pa. R.E. 803(3), the "state of mind" exception to the hearsay rule. That rule provides:

803(3) STATEMENT OF THEN EXISTING MENTAL, EMOTIONAL, OR PHYSICAL CONDITION.

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health. A statement of memory or belief offered to prove the fact remembered or believed is included in this exception only if it relates to the execution, revocation, identification, or terms of declarant's will.

The Commonwealth argues that the many statements heard by Joan's relatives and friends about Joan's deteriorating relationship with her husband and his behavior and statements to her are admissible because they show Joan's state of mind. The defendant argues that Joan's state of mind is not relevant, his is. He argues

that his statements to the police do not suggest a defense such as self-defense or accident, that would implicate the victim's state of mind. He contends that the statements are only being offered to prove the truth of the statements' contents — his bad character in his dealings with his wife and his propensity for violence.

Pennsylvania appellate cases have been less than consistent in dealing with this question. One line of cases has allowed statements of family members and other witnesses to testify to deceased victims' statements that they were fearful of the defendant. *See* for example, *Commonwealth v. Collins*, 703 A.2d 418, 424-25 (Pa. 1997 ), *cert. denied*, 294 525 U.S. 1015, 119 S.Ct. 538, 142 L.Ed.2d 447 (1998) (victim's statement that appellant had shot her in the past and would shoot her in the head if she messed up a drug package in her possession admissible under state-of-mind exception to prove motive), *Commonwealth v. Sneeringer*, 668 A.2d 1167 (Pa. Super. 1995) *appeal denied*, 680 A.2d 1161 (Pa.1996) (affirming trial court's decision to allow witness to testify about victim's stated intention to sever relationship with accused; evidence of victim's intent to end relationship allowed jurors to infer accused's motive for killing victim). *Commonwealth v. Chandler*, 721 A.2d 1040, 1045 (Pa. 1998) (Statements were admissible under the "state of mind" exception to the hearsay rule because victim's opinion of defendant and her marriage to him went to the presence of ill will, malice, or motive for the killing.), *Commonwealth v. Puksar*, 740 A.2d 219, 225 (Pa.1999), *cert. denied*, 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 42 (2000) (victim's statements that he did not trust defendant/brother and that he believed that defendant was trying to pass off replica model trains as originals were admissible to prove motive and ill will between brothers), *Commonwealth v. Fletcher*, 750 A.2d 261, 276 (Pa. 2000), (a homicide victim's out-

of-court statement regarding his relationship with the defendant was admissible to establish ill will, malice and motive for murder); *Commonwealth v. Stallworth*, 781 A.2d 110, 118 (Pa. 2001) (evidence concerning a victim's perception of her deteriorated relationship was relevant as to the defendant's intent and motive in a first degree murder trial) *Commonwealth v. Luster*, 71 A.3d 1029, 1041 (Pa. Super. 2013) (*en banc*) (affirming admission under Pa.R.E. 803(3) of decedent's hearsay statement that decedent was "scared" of defendant, that defendant was "trying to kill" decedent, and that defendant "was going to do something real bad to [decedent]"), *Commonwealth v. Kunkle*, 2013 WL 5935275, 10 (Pa. Super. 2013) (affirming admission of hearsay statements from the decedent that he was scared of the defendant and that if he were to end up dead it would be defendant's fault).

Other appellate cases have held that the decedent's statements are not admissible. In *Commonwealth v. Thornton*, 431 A.2d 248 (Pa.1981), a police officer was permitted to testify over objection that the victim told him he was carrying a gun because "the Thornton brothers were after him." The Pennsylvania Supreme Court held that the victim's statement was improperly admitted:

> The Commonwealth argues that Moore's declaration that he wanted protection because "the Thornton brothers were after him" was admissible to establish fear on the part of Moore and thus comes within the "state of mind" exception to the rule against hearsay. It is true that the declaration perhaps tends to establish that the victim, Moore, was fearful of the Thorntons. However, the victim's state of mind was not a matter in issue in the case. It was appellant's state of mind, not that of the victim, which was material to establish the degree of guilt, if any, on the charge of criminal homicide. *Cf.*

*Commonwealth v. Stewart, supra* (evidence of gang activity relevant to defendant's state of mind).

Only when the declaration is considered for the truth of the matter asserted, that appellant and his brother "were after" the victim, does the declaration become relevant, that is, both material to and probative of appellant's intent to kill. However, when considered for its substantive truth, the declaration, although relevant, is incompetent and hence inadmissible because it is hearsay not within any exception. Thus appellant's objection to admission of the declaration should have been sustained and the testimony excluded.

*Id.* at 251.

The Pennsylvania Supreme Court held in *Commonwealth v. Auker*, 681 A.2d 1305, 1319 (Pa. 1996) that while evidence of a victim's fear of a defendant may be relevant to a kidnapping charge, such evidence is "irrelevant to the charge of criminal homicide."

Our Supreme Court again held that the victim's state of mind was not admissible in *Commonwealth v. Laich*, 777 A.2d 1057, 1061 (Pa. 2001). There the defendant shot his girlfriend after finding her in bed with another man. At trial, a Commonwealth witness testified about statements the victim made to her approximately one week before the victim was shot and killed by the defendant. "She said that he said if he couldn't have her, if-that if he ever caught her with another man, that he would kill them both." *Id.* at 1060. At trial, the defendant admitted that he had killed his girlfriend, but argued that it was done in the heat of passion. The Pennsylvania Supreme Court determined that the victim's statements regarding defendant's jealous threats to kill her were "simply not relevant given appellant's defense" of sudden provocation and were thus

inadmissible. *Id.* at 1062.

A letter written by the victim of a homicide was the subject of a hearsay objection in *Com. v. Levanduski*, 907 A.2d 3 (Pa. Super. 2006) (*en banc*). The 'state of mind' exception at issue in *Levanduski* involved a letter, written by the victim, Sandt, describing several letters he found in which the defendant (the victim's common law wife) had written and received from a man (Fransen) that he suspected of being his wife's lover, Sandt's letter described that in one of the appellant's letters, she discussed getting "rid of [Sandt] so [the appellant and her lover] could be together." *Levanduski, Id.* at 9. The court noted:

> [i]n his letter, Mr. Sandt wrote about the relationship between appellant and Mr. Fransen and referred to: Appellant's allegations of spousal abuse; appellant's desire to further her relationship with Mr. Fransen; Mr. Sandt's own demand for his share of the marital property; and, the possible nexus between appellant and Mr. Fransen, and Mr. Sandt's missing .22 caliber revolver.

*Id.* at 18.

The *Levanduski* court applied the general rule of *Thornton* to find that the letter should have been excluded. The court distinguished *Levanduski* from *Chandler*, *Sneeringer*, and *Stallworth, supra,* because in those cases, "the victim's statements demonstrated the victim's intent to end a relationship with the accused, which allowed the jury to infer the accused's motive to kill the victim." *Id.* at 19-20.

The latest decision of the Pennsylvania Supreme Court to address this issue was *Commonwealth v. Moore*, 937 A.2d 1062 (Pa. 2007). In *Moore,* the testimony of the

victim's father, sister, and friend included statements made by the victim concerning bullying by the defendant. Citing *United States v. Brown*, 490 F.2d 758, 775 (D.C. Cir. 1973) (stating that, "to allow hearsay statements which relate past events on memory or belief under the state of mind exception would in effect swallow the hearsay rule") the court held that these hearsay references were inadmissible. The *Moore* court cited *Brown* in stating that "'factual statements offered as circumstantial evidence of a declarant's state of mind are to be considered solely on the issue of the declarant's mental state and not for the truth of the matters contained therein.'" *Moore*, 937 A.2d at 1072 (quoting *Brown*, 490 F.2d at 763). The prosecutor obtained the admission of the deceased victim's statements during the trial that he had been repeatedly bullied by the defendant and then used the evidence in closing argument:

> We started, Ladies and Gentlemen, with the motive. And you know something, I don't have to prove motive. That is not the same thing as intent. But motive lets you know why, why this happened, although quite frankly the why is never enough. [The victim] was the defendant's prey. He enjoyed taunting him, robbing him, assaulting him. [The victim] correctly feared this defendant up to the day he died. And for that [the victim] was ridiculed once again.... Do we not remember [the victim's father] said from the very beginning that [appellant] was a problem for his son? [The victim's sister] told you he used to try to bully my brother every time he saw him. Every time. Not just one little fight some time ago. That is not what we're talking about here. That evidence was given to you so that you knew what ill will there was, what malice there was in this man and how he treated [the victim]. It tells you the why. The events that happened after that go further because to understand a bully, this bully, and

how he acted when [the victim] finally, vainly tried to defend himself, is to understand how the end came.

*Id.* at 1072.

The Supreme Court stated: "(t)he Commonwealth's allusions to the victim's state of mind in this passage and otherwise are tangential, and it is readily apparent that the state of mind hearsay exception was used as a conduit to support the admission of fact-bound evidence to be used for a substantive purpose." *Id.* at 1073.

*Moore* is the last pronouncement on this subject by the Pennsylvania Supreme Court. The later decisions of the Pennsylvania Superior Court that addressed this issue in *Luster* and *Kunkle* cited above do not cite *Moore*.

Another recent case that should be noted that also does not cite *Moore* (in the majority opinion) is *Commonwealth v. Green*, 76 A.3d 575, 579 (Pa. Super. 2013). There Tiffeny Saunders, one of the deceased victim's friends, was permitted to testify that the victim told her "that she just needed to get away from" the defendant in the months prior to the shooting. Kahlia Trowery, the victim's sister, was permitted to testify that on August 4, 2010, the victim told her that she was afraid of the defendant and that she did not want "to go with him" anymore. *Id.* at 579.

The *Green* court found that it was error to admit these statements:

Considering the statements as evidence of appellant's motive, it appears impossible to demonstrate such an inference without accepting the statements for the truth of the matter asserted. To be relevant as to appellant's motive, we would have to accept that the victim was fearful of appellant and that she was attempting to end their relationship. To accept those conclusions as

the basis for appellant's motive is to accept the literal "truth" of the hearsay statements. If the victim was not, in fact, fearful of appellant and in the process of ending their relationship, then there was nothing about the hearsay statements that provided evidence of motive. Put more succinctly, it is only when the admitted hearsay statements are taken as truthful that they provide competent evidence of motive. *Thornton* rejected the admission of such statements under the 'state of mind' exception to the hearsay rule. Either these statements were relevant but inadmissible as hearsay without an applicable exception, or they were not hearsay, in which case they were irrelevant.

*Id.* at 581.

Another recent discussion of the state of mind exception occurred in a civil case, *Schmalz v. Manufacturers & Traders Trust Co. d/b/a M&T Bank*, 67 A.3d 800 (Pa. Super. 2013). The plaintiff's mother had purchased a $12,000 cd from First Federal in 1970. Her mother still had the original cd in her possession in 2003, and sought to redeem it. M&T Bank, First Federal's successor, had no record of the cd and refused to pay. Plaintiff's mother died at age 99 in 2008, and plaintiff sued M&T in 2009. By the time of trial the cd was worth approximately $141,000. Plaintiff sought to introduce statements by her mother to show that her mother was extremely upset about M&T Bank's refusal to honor the cd and its representation that it had no record of the cd. She asserted that this testimony was circumstantial evidence that the cd was not redeemed and "indicative of [her mother's] state of mind that she was upset and worried constantly about the CD that Bank refused to honor." *Id.* at 803.

Writing for the court, Judge Bowes reviewed the state of mind exception to the hearsay rule and found the mother's

150

statement to be hearsay. The court noted:

> "There are ordinarily three instances in which the state of mind exception is applicable. First, the exception may apply to prove the declarant's state of mind when that state of mind is an issue directly related to a claim or defense in the case. *See Laich, supra.* Second, the exception can apply to demonstrate that a declarant did a particular act that was in conformity with his or her statement after having made the statement. *See Commonwealth v. Riggins,* 478 Pa. 222, 386 A.2d 520, 526 (1978); *Ickes v. Ickes,* 237 Pa. 582, 85 A. 885, 887-888 (1912). Finally, an out of court statement related to the person's memory or belief is admissible in the limited instance where it relates to the "execution, revocation, identification or terms of the declarant's will." Pa.R.E. 803(3).

*Id.* at 804 -805.

The court found that the mother's state of mind was not relevant; the statement was only relevant to the case if the reason why the mother was angry was considered:

> Appellant's mother's emotions over M & T Bank declining to redeem the CD is only relevant as circumstantial evidence of the truth of her belief that she had not redeemed the CD. This latter evidence is classic hearsay that does not fall within any exception. Phrased differently, we may consider as substantive evidence that appellant's mother was upset based on her out-of-court statements; however, a court cannot utilize this statement as substantive evidence regarding whether the reason she was upset is truthful, i.e., that she never redeemed the CD. Indeed, any statements by appellant's mother regarding her memory or belief that are offered for the truth of that memory or belief

are inadmissible under Rule 803(3), unless relating to her will. Thus, out-of-court statements by appellant's mother as to why she was upset, i.e., her belief that she did not redeem the CD, are statements regarding her memory of the past and not her then existing state of mind.

*Id.* at 805.

The *Moore* decision and the reasoning in the recent *Green* decision support a decision to prevent the use of statements of the decedent's state of mind in this trial. The Commonwealth proposes to introduce Ms. Yale's statements through the testimony of at least seven witnesses, who are members of Joan Yale's family or were her friends. The number of different statements being offered through these witnesses is extensive. The witnesses appear to have been present at times when Edward Yale and Joan Yale were arguing, and to the extent that they heard Edward Yale's statements, those may be received as admissions. However, Joan Yale's statements of memory or belief offered to prove the facts remembered or believed will not be admitted.

In addition, the Commonwealth proposes to introduce notes written by the decedent. These notes include the descriptions of obscenities and epithets Yale directed to her, his controlling behavior and rage directed toward her. Again, this information is relevant not to show Joan Yale's state of mind, but to show Edward Yale's state of mind, and is therefore hearsay not covered by an exception and will not be admitted.

III. Commonwealth's Motion in Limine-Photographs

The Commonwealth filed a motion in limine regarding the use of photographs at trial. Specifically, the Commonwealth requests that all photographs placed into

evidence during the bail hearing held on August 23, 2013 be admissible at trial and that photographs "of the crime scene itself depicting the location of the victim and the items surrounding the victim as well as the stairwell in question" be permitted as evidence, ¶5, Commonwealth's motion in limine filed on November 8, 2013.

This motion was argued at the hearing held on November 22, 2013. At that time, attorney Anders advised the court that he had no objection to the introduction of the photographs of the decedent's body and of the scene of the alleged crime which he had received in discovery. This motion will be denied as moot, subject to the court's decision in its discretion to exclude cumulative or inflammatory photographs.

### IV. Defendant's Motion in Limine-Expert Reports

Defendant filed a motion in limine on November 21, 2013, seeking to preclude expert testimony by Trooper Philip Barletto concerning interpretation of blood stains. Defendant had earlier requested the production by the Commonwealth of expert reports "in the field of blood spatters." Defendant's omnibus pre-trial motion, ¶26. The Commonwealth advised the defendant at the time of the hearing on the defendant's omnibus motion that it did not intend to obtain an expert in this field for purposes of trial.

When defense counsel received notes of testimony of Trooper Barletto from the Commonwealth on November 19, 2013, the defense learned that Trooper Barletto had testified about blood spatter at the scene and that he did "forensic work" on the scene in 2001. ¶9, defendant's motion in limine, filed on November 21, 2013. Defendant requested a copy of Trooper Barletto's report and also asked that he be precluded as a witness. At that time, defendant's trial was scheduled to commence on December 4, 2013.

The Commonwealth responded that it did not have a report from Trooper Barletto other than police reports from the time of the Joan Yale's demise, and the testimony provided to the defense. The Commonwealth was not seeking an expert report from Trooper Barletto. Mr. Mancuso advised that he does intend to call Trooper Barletto as a witness and will attempt to qualify him as an expert in the field of crime scene analysis of blood spatter.

P.R.Crim.P. 573 B (1)(e) provides that disclosure by the Commonwealth of expert opinions is mandatory. In this case, Trooper Barletto did not prepare an expert report and therefore the Commonwealth did not have such a report to produce. However, the defense contended that it was surprised by the Commonwealth's intention to call Trooper Barletto as an expert witness, and that it had not obtained a defense expert in this field.

Since the Commonwealth intends to call Trooper Barletto as an expert, and the defense was given a transcript of his testimony on November 19 when trial was scheduled to commence approximately two weeks later, the court felt that it was necessary to grant some relief. It should be noted that the Commonwealth was required by court order to release Trooper Barletto's testimony when it did.

Pa.R.Crim.P. 573(E) addresses the remedy available when a party fails to comply with its discovery obligations. It states:

(E) Remedy.

If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection,

may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

Defendant's trial date was continued from December 4, 2013 to allow the defense to obtain an expert. This was done by order of November 22, 2013. Defendant's request to preclude the testimony of Trooper Barietto will be denied.

## V. Defendant's Motion in Limine Regarding May 29, 1989 Incident

The Commonwealth filed a "Notice Pursuant to Pennsylvania Rule of Evidence 404(b)" of its intention to offer evidence of an incident involving "the defendant's physical assault on Joseph Sukenick and the defendant's former wife, Ann Yale, for which the defendant was charged with two (2) counts of aggravated assault, simple assault, recklessly endangering another person, terroristic threats, harassment, unlawful restraint, false imprisonment, disorderly conduct and carrying firearms without a license." Commonwealth's 404(b) notice filed October 28, 2013. The notice contains Exhibit "A," which is a copy of a Pennsylvania State Police report by Trooper William Skotleski of an interview he conducted of Joseph Sukenick on August 9, 2012.

Trooper Skotleski relates the following in his report. Mr. Sukenick met Ann Yale through the Pocono Choral Society at a time when Ms. Yale was married to Edward Yale and the couple was living together. Mr. Sukenick stated that "all indications were" that Ann Yale "was attempting to get out of her marriage" with Edward Yale at that time, but he had never met Edward Yale, and had not discussed the Yale's marriage with Ann Yale.

On May 29, 1989, Sukenick and Ann Yale left choir practice in Sukenick's vehicle and planned to go out for pizza together. He parked his car on Crystal Street in East Stroudsburg at approximately 10:15 p.m. They exited his car and were walking across Crystal Street to a restaurant. Edward Yale appeared in the street in front of them, holding a handgun. Ann Yale said "that's Ed." An argument ensued during which Edward Yale was waiving the gun around and pointed the handgun at Sukenick's chest. Yale then struck Sukenick in the chin with the gun, knocking Sukenick to the ground. When Sukenick saw Yale attempting to load the gun with a magazine, he rushed Yale and knocked him to the ground. He was able to wrestle the gun from Yale's hand with the help of Ann Yale. Report of Trooper William Skotleski.

Charges were filed against Edward Yale as a result of the incident, including aggravated assault and other charges, although the defendant was apparently never convicted of them. Commonwealth's 404(b) notice ¶ 3. The notice states that Edward Yale referenced the incident in his discussions with state police on the day of Joan Yale's death. He provided the police with a newspaper article about the 1989 incident.

The Commonwealth seeks to introduce evidence of this incident as a prior bad act of the defendant, arguing that it shows motive, intent, absence of accident or mistake, method, identity and to rebut any character traits of peacefulness or abiding by the law. Commonwealth's 404(b) Notice, ¶ 4. The Commonwealth also contends that the newspaper article provided by the defendant on the day of Joan Yale's death should be admitted as "part of the res gestae of the investigation." *Id.* ¶ 5.

Defendant filed a motion in limine on November 13, 2013. Defendant contends that this evidence is not

admissible under P.R.E. 404(b)(2). Rule 404(b) provides as follows:

(b) Crimes, Wrongs or Other Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

(3) Notice in a criminal case. In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. Rule 404.

"The general rule in Pennsylvania is that evidence of crimes other than those charged in the case before the jury may not be presented at trial to prove the defendant's 'criminal character' or his tendency toward committing criminal acts." *Commonwealth v. Howard*, 749 A.2d 941, 952 (Pa. Super. 2000). However, exceptions exist where the evidence "is relevant for some other legitimate purpose and not merely designed generally to prejudice the defendant by showing him to be a person of bad character." *Commonwealth v. Davis*, 737 A.2d 792, 796 (Pa. Super. 1999).

Here the Commonwealth has offered several reasons

why the evidence is relevant and admissible. The first is motive. "To be admissible to show motive, the evidence must provide a sufficient ground to believe that the crime currently being considered grew out of, or was in some way caused by, the prior set of circumstances." *Commonwealth v. Spotz*, 756 A.2d 1139, 1153 (Pa. 2000). The incident involving the defendant, Mr. Sukenick and Ann Yale was years earlier and had no connection to this incident.

The Commonwealth also offered the evidence to prove intent. However, there has been no similarity shown between the incident in 1989 and the circumstances of Joan Yale's demise. The assault was 11 years earlier; it was not an assault upon Edward Yale's first wife, rather it was upon a man she was with. The assault had no connection at all with Joan Yale. The Supreme Court reversed a conviction in *Commonwealth v. Stanley*, 398 A.2d 631 (Pa. 1979) where evidence of earlier assaults on others was allowed at trial:

> Certainly appellant's prior assaults upon persons bearing no known similarity or connection to the victim and in circumstances in which appellant or his sister-in-law were in some way threatened show no intent, motive, plan, scheme, or design to kill the victim and reveal no malice or ill will against him.

*Stanley*, 398 A.2d at 634.

Here, as in *Stanley*, no intent, motive plan, scheme or design to kill Joan Yale is made more likely by this incident twelve years earlier involving other people. Its use would be relevant only to show a propensity to commit violent acts.

The Commonwealth also contends that the evidence is admissible to show absence of accident or mistake,

method and identity. There is no suggestion in the Commonwealth's case that Edward Yale accidentally killed Joan Yale. The defendant's statements deny any participation in the circumstances leading to Joan Yale's death. If an accused raises the defense that he did not intend to harm the decedent, evidence of other acts may be admissible to show an absence of accident as well as to demonstrate intent or malice. *Commonwealth v. Odum*, 584 A.2d 953 (Pa. Super. 1990). However, Edward Yale has denied being in the basement when Joan Yale died. Bringing evidence of an assault 12 years earlier against other people would not shed light on what happened in the Yale basement. Likewise, there is no similarity in the two episodes that would establish a modus operandi or a signature in the killing of Joan Yale. "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." *Commonwealth v. Hawkins*, 626 A.2d 550, 552 (Pa. 1993).

Defendant's motion in limine will be granted and this evidence will be excluded as evidence in the Commonwealth's case in chief.

### VI. Commonwealth's Motion in Limine Regarding Request for Polygraph of the Defendant

The Commonwealth has filed a motion in limine seeking to admit evidence of the continuing investigation of the state police following Joan Yale's demise, which included police attempts to administer a polygraph examination of Edward Yale. The Commonwealth's proffer is that at the scene on the day of Joan Yale's death, March 22, 2001, following initial questioning, Edward Yale declined to accompany troopers to their barracks for additional questioning or to take a polygraph, because he was suffering from chest pains. The police then went to defendant's residence on March 25, 2001 to obtain

additional information and to schedule a polygraph examination. Mr. Yale told the police that he was still not in a proper condition to cooperate. He had obtained an attorney by that point, and the next day, his attorney, Jeffrey Velander, Esq. contacted police and told them that his client was not able to take a polygraph examination for medical reasons. In June, 2002, Attorney Velander wrote to the investigating officer, to advise that his client was still unable to provide a polygraph examination for medical reasons. Commonwealth's Motion in Limine, ¶¶4-9.

It is well established that evidence of a defendant's refusal to take a polygraph examination is inadmissible. *Commonwealth v. Williams*, 307 A.2d 289, 291 (Pa. Super. 1973). As will be discussed, the Commonwealth proposes to avoid this bar by "exchanging the term "polygraph examination" and/or "lie detector test," etc. to "request for additional information: and/or "request for further interview" when the testimony is presented to the jury. Commonwealth's Motion in Limine, ¶10.

A recent *en banc* decision of the superior court, held as a matter of first impression in Pennsylvania that a non-testifying defendant's pre-arrest silence is deemed constitutionally protected, such that the government may not use such silence as substantive evidence of the defendant's guilt. *Commonwealth v. Molina*, 33 A.3d 51 (Pa. Super. 2011) (*en banc*). Earlier decisions have held however, that a non-testifying defendant's pre-arrest silence may be admissible for limited purposes other than substantive proof of the defendant's guilt. For example, if the defendant testifies, his pre-arrest silence may be used for impeachment purposes. *Commonwealth v. Bolus*, 680 A.2d 839, 843 (Pa. 1996).

Pre-arrest silence may also be used to establish the "extent and focus" of a police investigation. Judge Allen

explained this point in *Commonwealth v. Adams*, 39 A.3d 310 (Pa. Super. 2012):

> [i]n *Molina*, when Detective Hawthorne-Bey testified that Molina refused to cooperate with her investigation, the superior court held that the detective's testimony was "offered to denote the extent and focus of the police investigation with regard to [the victim's] disappearance," *Molina* at 56. Because the detective's testimony was offered for one narrow purpose, namely to demonstrate the extent and focus of the investigation, and because the revelation of Molina's silence was limited to its context, we indicated in *Molina* that the mere revelation of Molina's silence did not establish innate prejudice, nor was it used in a fashion likely to burden Molina's fifth amendment right or create an inference of admission of guilt. Molina, at 53-54. Rather, we held that the constitutional violation only arose when the Commonwealth, during closing argument, used the detective's testimony for a different purpose, i.e., as evidence of Molina's guilt. *Molina* at 53-54, 57.

*Id.* at 319.

> When a court allows comment in the Commonwealth's case in chief on a defendant's pre-arrest silence for a reason other than evidence of guilt, a balancing test must be used. The supreme court acknowledged this in *Commonwealth v. DiNicola*, 866 A.2d 329, 336 (Pa. 2005). There: [t]rial counsel's strategy was to question the government's preparation of its case, particularly in terms of the investigating trooper's pursuit of potentially exculpatory evidence. Since the trooper's investigation was obviously limited by appellee's decision to reject the request for an interview, we find

that the Commonwealth's elicitation of the trooper's testimony regarding this fact constituted fair response.

*Id.* at 336.

The *DiNicola* court also stated:

For purposes of fair response, admissibility is presently subject primarily to the trial court's assessment of probative value versus prejudicial effect on appropriate objection, as is the case with all other evidence adduced at trial. *See* Pa.R.E. 403.

*Id.*

Here the Commonwealth seeks to introduce evidence of continuing police efforts to obtain a polygraph examination of the defendant. The Commonwealth argues that it has a need for this evidence unrelated to using defendant's silence as substantive evidence of his guilt. Since Joan Yale died on March 22, 2001 and the criminal complaint charging defendant with criminal homicide was not filed until June 20, 2013, the Commonwealth offers this evidence to explain the time-line of the police investigation. This investigation involved the request for defendant to submit to a polygraph which the Commonwealth alleges continued through the receipt of a letter from defense counsel in June, 2002.

Offering the evidence for this purpose-to show the extent and focus of the investigation and to anticipate the defense argument that the case was "cold" from 2001 until 2013- would be relevant for a "fair response" to defendant's anticipated defense. Similar testimony was approved in *Commonwealth v. Adams*, 39 A.3d 310, 318 (Pa. Super. 2012).

However, applying the balancing test of Rule 403,

and after careful examination of the *Molina, Adams* and *DiNicola* cases, I have decided not to allow the evidence as part of the Commonwealth's case in chief. The reasons for this include 1) the police request to the defendant was for him to submit to a polygraph examination, not just an interview. The defendant may have had valid reasons to refuse to submit to a polygraph examination. Pennsylvania courts do not recognize their reliability, and results of a polygraph examination are inadmissible for any purpose. *Commonwealth v. Chester*, 587 A.2d 1367, 1376 (Pa. 1991). If the defendant's refusal were introduced, he would have no way of explaining his reluctance to take a polygraph. "Neither a professed willingness nor a refusal to submit to (a lie detector) test should be admitted." *Commonwealth v. Saunders*, 125 A.2d 442, 445-46 (Pa. 1956). The Commonwealth proposes to have the trooper testify that he was "seeking a further interview" from the defendant rather than use the term "polygraph examination." But that is not what actually was requested and to tell the jury something that was not accurate would not give the jury truthful information about the circumstances.

Secondly, the evidence is of marginal relevance for the purpose proposed; it is more relevant for the improper purpose of evidence of guilt. The death of Ms. Yale occurred in 2001; the attempts to get Mr. Yale to submit to an interview lasted until 2002. This evidence will explain a branch of the investigation until that time, but does not explain why the decision to prosecute was not made until 2013.

Finally, the decision in *Adams* hedged its conclusion by saying that even if the comment on the defendant's silence was admitted in error, it was harmless because the evidence of defendant's guilt was overwhelming. ("Finally, we conclude that even if impermissible, any error resulting

from the Commonwealth's references to appellant's silence was harmless.") *Adams*, 39 A.3d at 321. From what has been offered by the Commonwealth, this case will rely upon circumstantial evidence and expert testimony. Edward Yale's statements to the police indicate that the Yales were in their home by themselves that morning; he was upstairs watching television when his wife suffered fatal injuries in the basement. Commonwealth's Exhibit 1, October 21, 2013 omnibus hearing. The trial has not occurred and it remains to be seen what is proven by the Commonwealth, but similar to the situation in *Molina*, the prejudice caused by comment on Yale's refusal to submit to a polygraph examination or further interview is likely to outweigh its relevance.

## ORDER

And now, this 8th day of January, 2014, following consideration of the defendant's request for a bill of particulars, omnibus pretrial motion, and his motions in limine and the Commonwealth's motions in limine, it is ordered as follows:

1. The defendant's request for a bill of particulars is denied.

2. The defendant's request to suppress his statements to the police in the interview of June 21, 2012 is denied.

3. The defendant's request for production of grand jury testimony and expert reports is denied as moot.

4. Defendant's motion in limine to prevent the introduction of a writing by Joan Yale and her statements to others about matters she remembered or believed will be granted.

5. The Commonwealth's motion in limine to allow photographs of the crime scene depicting the location of

the victim and the items surrounding the victim as well as the stairwell in question will be permitted as evidence. Photographs of the decedent's body will be allowed but the court may disallow cumulative or inflammatory photographs.

6. The defendant's motion in limine to preclude expert testimony by Trooper Philip Barletto concerning interpretation of blood stains is denied. The court has granted a continuance of the December, 2013 trial date to give the defense an opportunity to retain its own expert on this subject.

7. The defendant's motion in limine to exclude evidence of the incident involving Edward Yale which occurred on May 29, 1989 in East Stroudsburg, Pennsylvania is granted, and that evidence offered by the Commonwealth under Rule 404(b) will be excluded.

8. The Commonwealth's motion in limine to allow introduction of evidence of police attempts to obtain a polygraph or further interview from the defendant following the statements he made at the scene on March 22, 2001, through June, 2002 is denied.