703 A.2d 418

COMMONWEALTH of Pennsylvania, Appellee,

v.

Ronald COLLINS, Appellant.

Supreme Court of Pennsylvania.

Argued Jan. 29, 1997.

Decided Nov. 20, 1997.

Reargument Denied March 2, 1998.

John T. Drost, John Belli, Philadelphia, for R. Collins.

Catherine Marshall, Thomas Dolgenos, Philadelphia, for the Commonwealth.

Robert A. Graci, Harrisburg, for Office of the Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

*OPINION*

NEWMAN, Justice.

On October 21, 1994, a jury found Appellant Ronald Collins guilty of two counts of first degree murder,[1] and one count each of aggravated assault,[2] possession of an instrument of crime,[3] and recklessly endangering another person.[4] These convictions stem from an aggravated assault on Lisa Tyler and the murders of David Sisco and Dawn Anderson. After a penalty hearing, the jury concluded that the aggravating circumstances outweighed the mitigating circumstances and set the penalty at death for each count of first degree murder.[5]

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S. § 2702(a)(1).

3. 18 Pa.C.S. § 907.

4. 18 Pa.C.S. § 2705.

5. The aggravating circumstances found concerning the murder of David Sisco were that Collins killed a prosecution witness to a murder or other felony that he committed for the purpose of preventing the

50

On April 20, 1995, the Court of Common Pleas of Philadelphia County (trial court) formally imposed the sentence of death. The court also imposed concurrent prison sentences of ninety to one hundred-eighty months for aggravated assault, twelve to twenty-four months for possession of an instrument of crime, and twelve to twenty-four months for recklessly endangering another person. Collins filed post-sentence motions, which the trial court denied. He then appealed directly to this Court pursuant to 42 Pa.C.S. § 722(4) and 42 Pa.C.S. § 9711(h)(1). For the reasons that follow, we affirm his convictions and judgments of sentence.

### Sufficiency of the Evidence

In all cases where the death penalty has been imposed, this Court performs an independent review of the sufficiency of the evidence regardless of whether the appellant seeks such review. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). When reviewing a sufficiency of the evidence claim, we view all of the evidence and the reasonable inferences to be drawn from that evidence in the light most favorable to the Commonwealth as verdict winner to determine if the evidence was sufficient to enable the fact finder to conclude that all of the elements of the offenses were established beyond a reasonable doubt. *Commonwealth v. Burgos*, 530 Pa. 473, 610 A.2d 11 (1992). To sustain a conviction for first degree murder, the Commonwealth must prove that a human being was unlawfully killed; that the accused did the killing; that the killing was done with malice aforethought; and that the killing was willful, deliberate and pre-

witness from testifying against him, 42 Pa.C.S. § 9711(d)(5), and that Collins had been convicted of another murder either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(11). The mitigating circumstance found was the character of the defendant. 42 Pa.C.S. § 9711(e)(8).

The aggravating circumstances found concerning the murder of Dawn Anderson were that Collins killed Anderson in furtherance of his drug business, 42 Pa.C.S. § 9711(d)(14), and that Collins had been convicted of another murder either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(11). The mitigating circumstance found was the character of the defendant. 42 Pa.C.S. § 9711(e)(8).

meditated, i.e., the defendant had a specific intent to kill. *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624 (1991). Specific intent to kill may be proven by circumstantial evidence, such as the accused using a deadly weapon on a vital part of the victim's body. *Commonwealth v. Rivers*, 537 Pa. 394, 644 A.2d 710 (1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 1270, 134 L.Ed.2d 217 (1996).

Viewed with these standards in mind, the evidence clearly was sufficient to support Collins' convictions for first degree murder. The events in this case revolve around a second floor apartment at 643 North 60th Street in West Philadelphia, where drugs were regularly sold and consumed. Marc Sisco maintained the apartment and managed the drug trade that occurred on the premises. Marc's brother, David Sisco, also lived in the apartment. Collins was a regular visitor to the apartment and often sold cocaine from that location. Collins' associates, Shawn Wilson and Dawn Anderson, also frequented the apartment.

Early in the morning of March 28, 1992, Collins and Marc Sisco were in the apartment and began arguing. Collins pointed a gun at Marc Sisco and shot him five times. When police arrived at the apartment, they found Marc Sisco lying on the bathroom floor. Medical personnel transported him to a hospital where he recovered from his wounds. Police recovered one bullet from the bathroom floor in the apartment and two bullets from Marc Sisco's body at the hospital. Two bullets remain inside him. After the shooting, David Sisco assisted the police in their investigation. He discussed the incident with a detective at the police station and accompanied the detective to the apartment, where he described how the shooting occurred.

A few days after the shooting, Collins was at the nearby residence of Annie "Mom" Holloman talking to a group of people when he threatened to shoot anyone who spoke to the police about the incident. He specifically mentioned David Sisco as a potential target.

On April 2, 1992, Collins confronted a woman named Lisa Tyler on the porch of Holloman's house and accused her of stealing drug money from him. Tyler denied the accusation and informed Collins that Dawn Anderson had stolen the drug money. Anderson had recently been spending large amounts of money, which was unusual. Despite Tyler's professed innocence, Collins fired a gun at her. The bullet tore a hole in her coat but did not strike her body.

At approximately 8:00 p.m. on April 5, 1992, Anderson was at Holloman's house with Holloman and Tyler. She told Holloman that she was going to work "around the corner", which Tyler understood to mean that Anderson was going to assist with drug sales at Marc Sisco's apartment. Before Anderson left, she told Holloman that she would bring some drugs back "if they don't kill me." She also told Holloman that "they shot her in the elbow one time and they said they were going to shoot her in the head." Holloman understood Anderson's reference to "they" to mean Collins and Wilson.

Later that evening, Gwendolyn Oliver accompanied Collins and Shawn Wilson to Marc Sisco's apartment. After talking and drinking beer for a short time in the apartment, Oliver, Collins and Wilson decided to go to a hotel. Oliver left the apartment to make a call from a telephone booth before going to the hotel. While at the phone booth, Oliver heard approximately five gun shots come from the apartment. Collins then ran out of the apartment, called to Oliver, and hailed a cab. Wilson exited the apartment a few moments later and joined Collins and Oliver in the cab.

While riding in the cab, Collins boasted that he had "served" someone, which Oliver understood to mean that he had harmed someone. Wilson responded that Collins had given them what they deserved, and the two men exchanged a "high-five". Collins then asked Wilson if he had seen "the blood squirting out" and showed blood stains on his shirt sleeve to Wilson. The trio stopped at a delicatessen to purchase beer and then went to the house of a man named Lonnie Boo. When they arrived at Lonnie Boo's house, Collins told Lonnie Boo that "we just had some drama". Collins then

gave his gun to Lonnie Boo for safekeeping. After drinking beer and playing cards, Collins and Wilson gave Oliver cab fare, told her to wait a few minutes before leaving, and then left Lonnie Boo's house.

On the morning of April 6, 1992, police arrived at Marc Sisco's apartment and discovered David Sisco unconscious and covered with blood on a bed. He had been shot approximately seven times and died at a hospital a few hours later. In another room, police found Dawn Anderson unconscious and covered with blood on a bed. She had been shot once in the head and died the following day. Police recovered two bullets from David Sisco's body, one bullet from Anderson's head and several bullets from the apartment.

Ballistics evidence showed that a single firearm had fired the two bullets recovered from David Sisco's body, the bullet recovered from Anderson's head, the bullets found in the apartment after David Sisco and Anderson were shot, the bullet found in the bathroom after Marc Sisco was shot on March 28, 1992, and at least one of the two bullets recovered from Marc Sisco's body. The other bullet recovered from Marc Sisco's body may have come from the same gun, but positive identification was not possible because the bullet became deformed after it was fired.

Based on the foregoing, there was sufficient evidence for a jury to conclude beyond a reasonable doubt that Collins murdered David Sisco as a reprisal for cooperating with the police and that Collins murdered Dawn Anderson because she allegedly stole money from him. *Burgos.* We now turn to the issues that Collins raises.

## *Severance*

At a pre-trial hearing, Collins made an oral motion to sever the charges relating to the shooting of Marc Sisco, the aggravated assault on Lisa Tyler, and the murders of David Sisco and Dawn Anderson. The trial court granted the motion in part. It ruled that the shooting of Marc Sisco was a separate criminal episode that should be tried individually.

The court also ruled that the assault on Lisa Tyler and the murders of David Sisco and Dawn Anderson could be tried together. Further, the court held that the evidence of the Marc Sisco shooting was admissible at the trial on the latter charges to establish a motive for the murder of David Sisco, and to establish the identity of the murderer because the same gun was used to shoot. Marc Sisco, David Sisco and Dawn Anderson.

■ Collins argues that the trial court erred in denying his motion to sever the charge of aggravated assault concerning the shot fired at Lisa Tyler from the charges of first degree murder concerning the shootings of David Sisco and Dawn Anderson. We disagree. The decision to sever offenses is within the sound discretion of the trial court and will be reversed only for a manifest abuse of that discretion. *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439 (1995); *Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61 (1994), *cert. denied*, 514 U.S. 1005, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995). Rules of Criminal Procedure 1127 and 1128 govern the joinder and severance of offenses and defendants, and provide in relevant part as follows:

**Rule 1127. Joinder—Trial of Separate Indictments or Informations**

A. Standards

(1) Offenses charged in separate indictments or informations may be tried together if:

(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) the offenses charged are based on the same act or transaction.

. . . .

**Rule 1128. Severance of Offenses or Defendants**

The court may order separate trials of offenses or defendants or provide other appropriate relief, if it appears that

any party may be prejudiced by offenses or defendants being tried together.

Pa.R.Crim.P. 1127; Pa.R.Crim.P. 1128.

 Reading these two Rules together, this Court set forth the following three-part test for deciding a motion to sever:

> Where the defendant moves to sever offenses not based on the same act or transaction that have been consolidated in a single indictment or information, or opposes joinder of separate indictments or informations, the court must therefore determine: [1] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [2] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, [3] whether the defendant will be unduly prejudiced by the consolidation of offenses.

*Commonwealth v. Lark*, 518 Pa. 290, 302, 543 A.2d 491, 496–97 (1988). Pursuant to the *Lark* test, a court must first determine if the evidence of each of the offenses would be admissible in a separate trial for the other. Evidence of crimes other than the one in question is not admissible solely to show the defendant's bad character or propensity to commit crime. *Commonwealth v. Newman*, 528 Pa. 393, 598 A.2d 275 (1991); *Lark*. However, evidence of other crimes is admissible to demonstrate (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) the identity of the person charged with the commission of the crime on trial. *Id*. Additionally, evidence of other crimes may be admitted where such evidence is part of the history of the case and forms part of the natural development of the facts. *Lark*.

Here, the evidence of the offenses of aggravated assault and first degree murder would have been admissible in separate trials for each other. The aggravated assault on Lisa Tyler would have been admissible in a separate trial for the first

degree murders to show motive because, immediately preceding the assault, Tyler told Collins that Dawn Anderson had stolen money from him, which provided Collins with a motive to murder Anderson. The aggravated assault also would have been admissible as part of the natural development of the facts because the assault and the murders demonstrated Collins' efforts to protect his drug trade and the two incidents occurred only three days apart. *See Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221 (1995) (evidence of assaults would have been admissible in a separate murder trial to show motive and history of the case where defendant murdered police officer while fleeing the scene of the assaults).

■ Reciprocally, evidence of the first degree murders would have been admissible in a separate trial for aggravated assault to prove intent and absence of mistake or accident. Although evidence of a subsequent offense is usually less probative of intent than evidence of a prior offense, evidence of a subsequent offense can still show the defendant's intent at the time of the prior offense. *Commonwealth v. Ritter*, 419 Pa.Super. 430, 615 A.2d 442 (1992), *appeal denied*, 535 Pa. 656, 634 A.2d 220 (1993); *Commonwealth v. Green*, 351 Pa.Super. 170, 505 A.2d 321 (1986), *appeal denied*, 513 Pa. 633, 520 A.2d 1384 (1987). Collins' subsequent shooting of Dawn Anderson, who allegedly stole money from him, demonstrates that his prior act of firing his gun at Lisa Tyler, whom he accused of stealing money from him, was intentional rather than accidental. Thus, the first prong of the *Lark* test is satisfied.

Next, we must decide if the evidence of the aggravated assault and the first degree murders was capable of separation by the jury. Where a trial concerns distinct criminal offenses that are distinguishable in time, space and the characters involved, a jury is capable of separating the evidence. *Lark*. Here, the aggravated assault and the first degree murders occurred three days apart in different locations and involved different victims. Thus, there was no danger that the jury would confuse the offenses.

 Lastly, we must decide if Collins was unduly prejudiced by the consolidation of the offenses at trial. Pa. R.Crim.P. 1128. As we explained in *Lark,*

> [t]he "prejudice" of which Rule 1128 speaks is not simply prejudice in the sense that appellant will be linked to the crimes for which he is being prosecuted, for that sort of prejudice is ostensibly the purpose of *all* Commonwealth evidence. The prejudice of which Rule 1128 speaks is, rather, that which would occur if the evidence tended to convict appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence.

*Lark,* 518 Pa. at 307, 543 A.2d at 499. Additionally, the admission of relevant evidence connecting a defendant to the crimes charged is a natural consequence of a criminal trial, and it is not grounds for severance by itself. *Paolello.* Here, Collins engaged in a series of separate criminal offenses to protect his drug trade. There was no prejudice in permitting the jury to convict him based on the distinct, yet interrelated, evidence of those crimes. Accordingly, the trial court properly denied Collins' motion to sever. *Lark; Paolello.*

### Hearsay

 Collins next argues that the trial court erred by permitting Lisa Tyler and Annie Holloman to testify concerning inadmissible hearsay statements that Dawn Anderson made in their presence on the evening of the murders. Specifically, Collins objects to the emphasized portions of the following exchanges:

[Prosecutor]: What, if anything, did Miss Anderson say to you?

[Tyler]: *She said, "Mom [Holloman], I'll be back I'm going to work around the corner. I'll bring you something back if they don't kill me."*

[Prosecutor]: So who else was present when that conversation took place?

[Tyler]: Mom.

58

[Prosecutor]: And yourself?

[Tyler]: Yes.

[Prosecutor]: And that "Mom," again, being Annie Holloman?

[Tyler]: Holloman.

[Prosecutor]: Did you know where Miss Anderson worked?

[Tyler]: She worked around at Dave's answering the door.

[Prosecutor]: When you say "answering the door," what do you mean?

[Tyler]: For the drugs, let the drug sellers in—I mean buyers in.

\* \* \*

[Prosecutor]: Now, Miss Holloman, before Miss Anderson left your residence or home on Edgewood Street what, if anything, did she say to you about where she was going and what she was going to do?

[Holloman]: She had a package of drugs.

[Prosecutor]: How do you know that?

[Holloman]: Because I was looking at them.

[Prosecutor]: Well, how did they come out that you looked at them?

[Holloman]: She took them out of her sock.

[Prosecutor]: When she took them out of her sock, what happened?

[Holloman]: *She said she had to go back around the corner because they needed her and they couldn't do without her. Then she asked me did I want some of the drugs, I told her no—no, she told me that if she messed up the pack what was going to happen to her.*

[Prosecutor]: What did she say was going to happen?

[Holloman]: *She said they shot her in the elbow one time and they said they were going to shoot her in the head.*

Notes of Testimony, October 18, 1994 at 85 (emphasis added); Notes of Testimony, October 19, 1994 at 107 (emphasis added). The Commonwealth contends, on the other hand, that these statements were admissible pursuant to the state of mind exception to the rule against hearsay. We agree.

 Hearsay is an out-of-court statement offered for the truth of the matter asserted in the statement. *Commonwealth v. Jones,* 530 Pa. 591, 610 A.2d 931 (1992). The rule against admitting hearsay evidence stems from its assumed unreliability because the declarant is not before the trier of fact and cannot be challenged regarding the accuracy of the statement. *Commonwealth v. Rush,* 529 Pa. 498, 505, 605 A.2d 792 (1992). Hearsay testimony also violates the defendant's right of confrontation. *Id.*

 Nonetheless, there are several recognized exceptions to the hearsay rule. *See Commonwealth v. Wright,* 455 Pa. 480, 317 A.2d 271 (1974). The exception at issue here, state of mind, is well-established. *Commonwealth v. Auker,* 545 Pa. 521, 681 A.2d 1305 (1996); *Commonwealth v. Lowenberg,* 481 Pa. 244, 392 A.2d 1274 (1978); *Commonwealth v. Riggins,* 478 Pa. 222, 386 A.2d 520 (1978); *Commonwealth v. Marshall,* 287 Pa. 512, 135 A. 301 (1926); *Ickes v. Ickes,* 237 Pa. 582, 85 A. 885 (1912). We explained the rationale for the state of mind exception as follows:

Intention, viewed as a state of mind, is a fact, and the commonest way for such a fact to evince itself is through spoken or written declarations. It is therefore because of the impossibility, in many cases, of proving intention apart from personal declarations, that they are admitted. The true basis of their admission, then, is necessity, because of which an exception to the hearsay rule is recognized....

*Marshall,* 287 Pa. at 522, 135 A. at 304. Where the declarant's out-of-court statements demonstrate his or her state of mind, are made in a natural manner, and are material and relevant, this Court has held that the statements may be admitted. *Riggins; Commonwealth v. Thomas,* 410 Pa. 160, 189 A.2d 255, *cert. denied,* 375 U.S. 856, 84 S.Ct. 118, 11 L.Ed.2d 83 (1963). The determination of whether such statements are admissible is within the sound discretion of the trial court and will be reversed only upon an abuse of that discretion. *Commonwealth v. Ragan,* 538 Pa. 2, 645 A.2d 811 (1994).

On several occasions, we have held that a deceased victim's out-of-court statements evincing an intent to meet the defendant shortly before the killing were admissible pursuant to the state of mind exception because such an intent provided circumstantial evidence that the victim did meet with the defendant. *Lowenberg* (victim told third person that she wanted to see the defendant concerning a serious financial matter); *Riggins* (victim told third party that she expected defendant to visit her home); *Marshall* (victim told third party that she was going to meet defendant and would disclose her affair with another man); *see also Commonwealth v. Sneeringer*, 447 Pa.Super. 241, 668 A.2d 1167 (1995), *appeal denied*, 545 Pa. 651, 680 A.2d 1161 (1996) (victim told third parties that she intended to end her relationship with the defendant); *Commonwealth v. Henderson*, 324 Pa.Super. 538, 472 A.2d 211 (1984) (victim told third parties that he intended to meet with defendant to sell his automobile). In each case, the victim's intent to meet the defendant was relevant to the case because it permitted the jury to conclude that the defendant had the opportunity to commit the crime in question. Additionally, the victim's intent to confront the defendant about a financial matter in *Lowenberg* and the victim's intent to disclose her affair in *Marshall* were relevant to supply the jury with a potential motive for the killing in those cases.

In the present case, Anderson expressed an intent to meet with Collins shortly before her death and was concerned that Collins would harm her if she hindered his drug trade. These out-of-court statements appear to have been made in a natural manner during casual conversation. Further, the statements permitted the jury to conclude that Anderson met with Collins, giving him the opportunity to kill her. *Lowenberg; Riggins; Marshall.* They also supplied the jury with a motive for Collins to kill Anderson. *Lowenberg; Marshall.* Thus, the trial court properly admitted the statements under the state of mind exception to the hearsay rule.

### Statutory Review

Having addressed each of Collins' claims, we now conduct the review mandated by 42 Pa.C.S. § 9711. Section 9711

requires this Court to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h)(3).[6]

Our review of the record indicates that Collins' death sentence was not the product of passion, prejudice or any other arbitrary factor. Additionally, there was sufficient evidence to support the aggravating circumstances the jury found regarding each of the first degree murders. Lastly, we have conducted an independent review of the sentencing data compiled by the Administrative Office of Pennsylvania Courts. Considering both the circumstances of the crime and the character and record of the defendant, we find that the sentence of death is not disproportionate to the penalty imposed in similar cases.

Accordingly, we affirm the verdicts and sentences of death.[7]

NIGRO, J., files a concurring opinion.

NIGRO, Justice, concurring.

I join in the Majority's decision. I write separately only to clarify a point involving the hearsay statements of Dawn Anderson.

**6.** Effective June 25, 1997, the General Assembly repealed proportionality review from the death penalty statute by deleting all of subsection (h)(3)(iii) and a portion of subsection (h)(4) that references proportionality review. Act of June 25, 1997, No. 28, § 1 (Act 28), effective immediately. However, because Collins' death sentence was imposed before the effective date of the act, he is entitled to proportionality review. *Commonwealth v. Gribble,* — Pa. —, 703 A.2d 426 (1997).

**7.** We direct the Prothonotary to transmit the complete record of this case to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).

Annie Holloman and Lisa Tyler did not testify that Anderson mentioned Appellant by name in any of the statements she made prior to leaving Holloman's residence. Both Holloman and Tyler indicated that Anderson used the word "they." *See* N.T., 10/18/94, at 85; 10/19/94, at 107. The statements in question were therefore rather vague and did not constitute completely reliable evidence of Appellant's guilt.

The vagueness of the statements, however, simply goes to their weight. Defense counsel recognized this at trial and used it to his advantage by highlighting the indefinite nature of the statements. For example, on cross-examination, Lisa Tyler admitted that she did not know to whom Anderson was referring when she stated that "they" might kill her. *See* N.T., 10/18/94, at 96–98. Holloman, in turn, testified on cross that she had understood Anderson to be referring to Appellant and/or Shawn Wilson when she stated that "they" had shot her in the elbow. *See* N.T., 10/19/94, at 109–10.

Given this, and the fact that the state-of-mind exception to the hearsay rule applies in this case, it is clear that the trial court did not err in admitting the statements in question.