J-S56028-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL ALAN WILKINS | |
| Appellant | No. 1401 MDA 2015 |

Appeal from the Judgment of Sentence July 16, 2015
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0003315-2013

BEFORE:  BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, J.                **FILED AUGUST 26, 2016**

Appellant, Michael Alan Wilkins appeals from the judgment of sentence entered after he was convicted of, among others, three counts of first degree murder. Wilkins raises multiple challenges to his convictions, including an argument that the trial court erred in not severing the trial of the third murder from the other two. After careful review, we affirm.

In the early morning of December 4, 2012, gunmen shot and killed Dario R. McLemore and Rafael Alequin in Reading. Three weeks later, the charred body of Jennifer Velez-Negron was found near a road in Lehigh County. A wad of cloth was taped into her mouth, and heroin and cocaine were found in her system.

---

[*] Former Justice specially assigned to the Superior Court.

The Commonwealth charged Wilkins with the murder of all three victims. At trial, the Commonwealth presented the following evidence to support its charges. Carlos Vargas-Osario testified that he lived with Wilkins and Wilkins's brother, Maurice. In the early morning of December 4, 2012, Vargas-Osario drove to Reading in his blue Camaro to find narcotics to purchase. While there, Wilkins pulled alongside him in an SUV. Vargas-Osario noticed that both Maurice and Wilkins's girlfriend, Velez-Negron, were in Wilkins's SUV.

Wilkins instructed Vargas-Osario to follow him. Vargas-Osario proceeded to follow the SUV in his Camaro. Shortly thereafter, he observed Maurice leave the SUV and discharge a firearm several times into a nearby vehicle. Maurice then got into the Camaro, and Vargas-Osario began to drive away. As he left the scene, he watched as someone fled the vehicle Maurice had shot at. He heard gunfire erupt from driver's side of Wilkins's SUV.

Reading Police Officer Tina Fallstich was on patrol at the time of the shooting and heard the shots from a nearby intersection. She proceeded to the location of the shooting and eventually discovered the body of Rafael Alequin slumped over in the passenger seat of a vehicle double parked in the road. As she was radioing in her observation, she noticed the body of Dario McLamore face down several feet away on the sidewalk.

The Commonwealth presented video from a nearby security camera. Investigator Eric Driesbach described the video as it played to the jury:

> The video … shows … three vehicles pulling up, stopping for what appears to be a red light, obviously, because they all stopped. A gentleman gets out of the passenger side of the second vehicle in line, walks over to the curb on the north side of the block right next to the first parked car, approaches the car, appears to fire at least two gunshots at the car. The first car pulls through the intersection. The gentleman walks a little bit north on South Tenth Street. The other two vehicles go through the intersection and then the male returns to the third vehicle in line that was originally stopped in line.

While the video did not display the shooting of Dario McLamore, spent cartridges found near his body were of a different caliber than those found in the area of the body of Rafeal Alequin.

Vargas-Osario testified that Wilkins later admitted to the killing by explaining his motive. McLamore and Alequin had previously sold Wilkins fake narcotics for $800. Furthermore, he testified that Wilkins was angry with his girlfriend, Velez-Negron, as she had introduced Wilkins to McLamore and Alequin.

Javonda Lebo testified that Wilkins and his brother had confessed to the shootings later in the morning of December 4. Wilkins expressed to her that Velez-Negron was at fault for the drug deal gone wrong, and that Velez-Negron "got to go, like for setting them up." Approximately two weeks later, Wilkins and Maurice asked Lebo to create a mixture of cocaine and heroin in an effort to get Velez-Negron to overdose. When this attempt failed, Wilkins and his brother attempted to convince Velez-Negron to administer the fatal narcotic cocktail to Vargas-Osario.

After Velez-Negron's burnt body was discovered, Maurice showed Lebo a video of Velez-Negron taped to a chair. Maurice told Lebo that he and Wilkins had given Velez-Negron three bags of heroin. Wilkins was standing next to the chair, holding a clear plastic bag. Maurice asked Velez-Negron whether she would set anyone else up, and she shook her head. One of the men shoved a white cloth in Velez-Negron's mouth. Wilkins placed the plastic bag over Velez-Negron's head as the men threatened her. After playing the video, Wilkins admitted to Lebo that he had murdered Velez-Negron.

The jury found Wilkins guilty of three counts of first degree murder, two counts of conspiracy to commit murder, one count of kidnapping, one count of criminal solicitation to commit murder of Vargas-Osario, and several other lesser charges. After a penalty phase trial, the jury reached a unanimous verdict of life imprisonment for the murder of Alequin. However, the jury could not reach a unanimous verdict for the murders of McLamore and Velez-Negron. As a result, the trial court imposed an aggregate sentence of three consecutive lifetimes. This timely appeal followed.

On appeal, Wilkins first argues that the trial court erred in failing to grant his motion to sever the trial on the charge of the murder of Velez-Negron from the trial of the other two murder charges. He contends that the crimes were not factually related, and that the joint trial prejudiced him unfairly.

We will reverse a trial court's decision to consolidate offenses for trial only if in doing so it abused its discretion. To address Wilkins's challenge, we must determine:

> [1] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [2] whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative; [3] whether the defendant will be unduly prejudiced by the consolidation of offenses.

*Commonwealth v. Boyle*, 733 A.2d 633, 635 (Pa. Super. 1999) (citation omitted). *See also* Pa.R.Crim.P. 582 and 583.

Accordingly, our first step is to determine whether the evidence regarding Wilkins's involvement in Velez-Negron's murder would have been admissible if that count had been tried separately. It is impermissible to present evidence at trial of a defendant's prior bad acts or crimes to establish the defendant's criminal character or proclivities. *See Commonwealth v. Hudson*, 955 A.2d 1031, 1034 (Pa. Super. 2008). Such evidence, however, may be admissible "where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." *Commonwealth v. Russell*, 938 A.2d 1082, 1092 (Pa. Super. 2007) (citation omitted). The Rules of Evidence specifically provide that "[e]vidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Pa.R.E. 404(b)(2).

Here, we have little difficulty in concluding that the evidence of each crime would have been admissible in separate trials. The evidence linking Wilkins to the murder of Velez-Negron would have been admissible in a separate trial for the murders of McLamore and Alequin, as it tended to establish Wilkins's consciousness of guilt for these slayings. *See Commonwealth v. Irons*, 326 A.2d 488, 491 (Pa. Super. 1974). Similarly, evidence of Wilkins's involvement in the killings of McLamore and Alequin would have been admissible in a separate trial for the murder of Velez-Negron as evidence of Wilkins's motive for the murder. *See Commonwealth v. Paddy*, 800 A.2d 294, 307 (Pa. 2002).

The next step is to determine whether joinder of the trials poses a danger of confusing the jury. Where the criminal offenses at issue are distinguishable in time, place and parties involved, there is no danger of jury confusion. *See Commonwealth v. Collins*, 703 A.2d 418, 423 (Pa. 1997). Here, the crimes occurred in different places, at different times, and involved different victims; there was no danger of confusing the jury with evidence of each crime.

Finally, we must determine whether joinder of the trials unfairly prejudiced Wilkins.

> The "prejudice" of which Rule [583] speaks is not simply prejudice in the sense that appellant will be linked to the crimes for which he is being prosecuted, for that sort of prejudice is ostensibly the purpose of *all* Commonwealth evidence. The prejudice of which Rule [583] speaks is, rather, that which would occur if the evidence tended to convict appellant only by showing

his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence.

*Newman*, 598 A.2d 275, 279 (Pa. 1991) (citation omitted). Given the breadth of the Commonwealth's evidence regarding each murder, we cannot conclude that the joint trial resulted in the jury convicting him merely due to his propensity to commit crimes. Rather, the evidence, taken as a whole, demonstrated an ongoing criminal enterprise based upon Wilkins's belief that he had been cheated in a narcotics transaction with McLamore and Alequin. Under these circumstances, we cannot conclude that the trial court abused its discretion in refusing to sever the charges. Thus, Wilkins's first issue on appeal merits no relief.

In his second issue, Wilkins challenges the sufficiency of the evidence to establish that he participated in a conspiracy to kill McLamore and Alequin. "The standard for review is whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the factfinder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." *Commonwealth v. Thompson*, 922 A.2d 926, 928 (Pa. Super. 2007) (citation omitted). "To sustain a conviction of criminal conspiracy[,] … [t]he Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal

intent, and (3) an overt act done in furtherance of the conspiracy." ***Commonwealth v. Bricker***, 882 A.2d 1008, 1017 (Pa. Super. 2005) (citation omitted); ***see also*** 18 Pa.C.S.A. § 903. Circumstantial evidence may suffice as proof of the conspiracy. ***See Bricker***, 822 A.2d at 1017.

Wilkins contends that the Commonwealth presented no evidence beyond his mere presence to support his convictions for the murder of McLamore and Alequin. However, this argument misconstrues the evidence at trial. The Commonwealth presented evidence that Wilkins admitted that he and Maurice killed McLamore and Alequin because the victims had cheated Wilkins in a prior narcotics transaction. ***See*** N.T., Trial, 6/8/15 – 6/12/15, at 653. Furthermore, the Commonwealth presented evidence that Wilkins attempted to cover-up his involvement in the murders of McLamore and Alequin. ***See id***., at 654-662. This evidence was sufficient to permit the jury to infer that Wilkins and his brother were acting upon an agreed course of conduct when McLamore and Alequin were murdered. Thus, Wilkins's second issue on appeal merits no relief.

Next, Wilkins argues that the trial court should have provided special interrogatories for the jury to answer while it deliberated. Wilkins concedes that no Pennsylvania authority exists to support his argument. ***See*** Appellant's Brief, at 20. Indeed, as the Commonwealth points out, the use of special interrogatories in criminal trials "has been almost universally condemned." ***Commonwealth v. Jacobs***, 39 A.3d 987, 987 (Pa. 2012)

(citation omitted). Under these circumstances, we cannot conclude that Wilkins's third argument on appeal merits any relief.

In his fourth issue, Wilkins challenges the trial court's failure to order a new trial based upon the weight of the evidence. However, Wilkins did not raise this challenge before the trial court. "Failure to challenge the weight of the evidence presented at trial in an oral or written motion prior to sentencing or in a post-sentence motion will result in waiver of the claim." **Commonwealth v. Bryant**, 57 A.3d 191, 196 (Pa. Super. 2012) (citation omitted). The trial court notes that Wilkins did not raise this issue before appeal, and our review of the certified record reveals that there was no oral challenge or written post-sentence motion. As a result, Wilkins's fourth issue on appeal is waived.

In his fifth and final issue, Wilkins argues that the trial court erred in admitting evidence that he had attempted to interfere with the testimony of potential witnesses to the crimes. "[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." **Commonwealth v. Fransen**, 42 A.3d 1100, 1106 (Pa. Super. 2012), **appeal denied**, 76 A.3d 538 (Pa. 2013) (citations omitted). As noted above, evidence of prior bad acts is not admissible purely to blacken a defendant's character. However, this evidence may be admitted where its probative value outweighs its potential for unfair prejudice to the defendant.

Evidence that Wilkins attempted to influence the availability and testimony of witnesses at his trial was relevant evidence of his consciousness of guilt. *See Commonwealth v. Bradley*, 69 A.3d 253, 258 (Pa. Super. 2013). Furthermore, as we noted above, the breadth of the Commonwealth's evidence linking Wilkins to the murders supports the trial court's conclusion that the jury was not likely to convict Wilkins based merely upon his proclivity to commit crimes. Rather, this evidence fit clearly within the Commonwealth's case that Wilkins was involved in a vendetta against the victims that led to the victims' deaths. Wilkins's final issue on appeal merits no relief.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/26/2016

- 10 -