J-S35018-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AUSTIN TEXAS HOUSTON KELLEY | : | |
| | : | |
| Appellant | : | No. 271 MDA 2022 |

Appeal from the Judgment of Sentence Entered January 20, 2022
In the Court of Common Pleas of Cumberland County Criminal Division at
No(s): CP-21-CR-0003462-2018

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McLAUGHLIN, J.:          **FILED JANUARY 24, 2023**

Austin Texas Houston Kelley appeals from the judgment of sentence entered following his convictions for three counts of unlawful contact with a minor; two counts each of indecent assault, criminal solicitation to commit statutory sexual assault, and criminal trespass; and one count each of burglary, involuntary deviate sexual intercourse, aggravated indecent assault, and statutory sexual assault.[1] Kelley argues the trial court erred in denying his motion to sever, permitting the Commonwealth to present expert testimony on the dynamics of sexual violence, and determining that he was a sexually violent predator ("SVP"). We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 6318(a)(1), 3126(a)(8), 902(a), 3503(a)(11), 3502(a)(i), 3123(a)(7), 3125(a)(8), 3122.1(a)(1), respectively.

The Commonwealth filed one Information, listing charges related to three victims. On August 27, 2019, the parties informed the court that the case was ready for trial, and the court scheduled trial for September 9, 2019. On August 27, the Commonwealth indicated to Kelley's counsel that she would seek to introduce expert testimony. Omnibus Pre-Trial Motion, filed Sept. 5, 2019, at ¶ 10. The following day, August 28, 2019, the Commonwealth provided written notice of its intent to present expert testimony on "generalities with regard to sexual offender/predator behaviors." Motion to Continue Pretrial/Trial, filed Sept. 4, 2019, at Exh. A. The Commonwealth stated in the written notice that it was late because the parties had been working toward a plea agreement and, therefore, "there [had been] no need to pursue the retention of an expert." *Id.* The Commonwealth attached to the notice a copy of the expert's curriculum vitae and stated it would forward a report when it received one. *Id.* Kelley filed an unopposed motion to continue, which was granted.[2]

In September 2019, Kelley filed an omnibus pre-trial motion, which he later amended. The omnibus motion included, among other things, a motion to sever and a motion to preclude the expert testimony.

_____

[2] Trial originally was rescheduled for November 2019, but, following additional continuances, did not occur until October 2020.

The parties submitted briefs regarding the motion to sever. The trial court summarized the alleged facts from the hearing on the pretrial motion to sever as follows:

> [I]n August 2016, [Kelley] met M.M. at the Midway Skating Rink when she was approximately 14 years old. He then communicated with her via social media, utilizing the screen name "Superman100" on Facebook, and referring to himself as a "superhero." On February 9, 2017, [Kelley] went to M.M.'s house, and entered through her bedroom window; he did not have her parents' permission to be in the home. While M.M. denies any sexual contact between her and [Kelley], her father did see [Kelly] in M.M's bed.
>
> [Kelley] also met 15-year-old K.W. at the Midway Skating Rink in August of 2016, following which he communicated with her as "Superman." Around the same time period, [Kelley] met 14-year-old S.B. at the Midway Skating Rink, and began an ongoing sexual relationship with her, which lasted for approximately eight months.
>
> On one particular occasion, March 12, 2017, [Kelley] climbed in the window of S.B.'s bedroom, while K.W. was visiting S.B. [Kelley] was watching a movie on S.B.'s bed with the two girls, when he attempted to kiss K.W., saying he was a superhero and would "save her." He touched her butt and breasts, and put his hands and mouth on her vagina; K.W. became very uncomfortable and moved to the floor. [Kelley] and S.B. then engaged in sexual conduct on S.B.'s bed.[1]
>
> > [1] Since his arrest, [Kelley] and S.B. have continued to correspond in writing, with [Kelley] continuing to utilize his "superhero" persona.

Trial Court Opinion, filed Oct. 7, 2020, at 1-2.

The trial court denied the motion to sever. It found the Commonwealth had demonstrated the existence of a common scheme, plan, or design, the evidence would support a finding of Kelley's intent, and the jury would be

- 3 -

capable of avoiding confusion. It also found the consolidation would not unduly prejudice Kelley. *Id.* at 4-5.

In the motion to preclude the expert testimony, Kelley claimed, among other things, that the Commonwealth provided its notice of expert testimony late, which hindered his ability to respond to the testimony. He also argued that the proposed basis of the testimony was "likely to be confusing, vague, and [was] not opinion testimony relevant to the facts of [the] case." Amended Omnibus Pre-Trial Motion, filed Nov. 7, 2019, at ¶ 11. At the hearing, Kelley again argued the testimony was not relevant and would be confusing to the jury. N.T., Oct. 14, 2020, at 24. The Commonwealth asserted it informed Kelley of its intention to present expert testimony after defense counsel certified the case for trial, stating that the late notice was due to the Commonwealth's impression the case would be resolved by plea agreement.

The trial court summarized the testimony from the hearing on the expert testimony as follows:

> At a hearing on the expert witness issue, testimony was received from the Commonwealth's proposed expert, Matthew Shollenberger, Ph.D., P.C., and two Commonwealth exhibits were admitted in the form of his curriculum vitae and his report.
>
> Dr. Shollenberger testified that he was a sex offender counselor, with a Ph.D. in counseling, who had been working with sex offenders for 25 years, had been approved as a provider by Pennsylvania's Sexual Offenders Assessment Board since 2002, and had presented expert testimony in court hundreds of times. The gist of his opinions of pertinence to the present case was contained in a report dated September 17, 2019:

- 4 -

This letter is a very brief summary of sexual offenders' characteristics based on over 25 years of education and experience: Sexual exploit is about control, and overwhelmingly statically [sic] the sexual exploiter is a biological male. Most sexual offenders have multiple victims, sometimes dozens, due to the secrecy of the crime and the reluctance for victims to come foreword [sic], hence encouraging the sexual predator to believe he has gotten away with the crime(s). Sexual predators will most likely tell their victims to remain secretive about the sexual abuse and/or threaten them with retaliation should they tell. The large majority of victims are not strangers; sexual predators get to know their victims (as quickly as possible) in order to assess vulnerability and establish trust. The sexual predator may use special favors like excessive attention, praise, favoritism, or gifts to establish trust. They use the trust that has been established as a control mechanism, exploiting the victims' feelings of guilt, loyalty, or dependency. Adolescents who have special needs, are having identity issues, feeling unloved, or having peer issues are vulnerable to the attention of a sexual predator. Many times, pedophiles in particular do not relate to peers their own age; they do not think or feel like a responsible adult, and they "fit in" with younger peers. Pedophiles tend to frequent locations where children and/or adolescents are found with minimal supervision, intent on preying upon naive, impressionable, and vulnerable victims. Sexual predators rationalize their crimes to themselves and minimize their crimes to other[s] when caught. Lastly, many sexual predators are narcissistic[.] Narcissism is clinically defined as a grandiose sense of self-importance and preoccupation with fantasies of power, a belief that he is unique, has a need for excessive admiration, has a sense of entitlement, a lack of empathy, envious of others and an arrogant attitude.

On cross-examination, Dr. Shollenberger was acknowledged by [Kelley's] counsel to be an expert in the field of sexual offense counseling.

Trial Court Opinion, filed Apr. 16, 2022, at 14-15 (alterations in original) ("1925(a) Op.").

The trial court denied the motion to preclude the expert testimony and permitted the Commonwealth to present the expert opinion of Dr. Matthew Shollenberger. However, it put limits on his testimony and barred him from testifying "regarding specifics of this case." Order, filed Oct. 15, 2020.

After a trial, the jury convicted Kelley of the above-referenced offenses.[3] The trial court sentenced him to an aggregate sentence of 18 to 50 years' incarceration.[4] It then held an SVP hearing and heard testimony from both an expert presented by the Commonwealth and an expert presented by Kelley.

The Commonwealth's expert, Corrine Scheuneman, M.A., L.P.C., a member of Pennsylvania's Sexual Offenders Assessment Board ("SOAB"), opined that Kelley has hebephilia, which is a condition where "an individual [is] sexually attracted to adolescents whose pubescence or secondary sex characteristics are just emerging." N.T., July 2, 2021, 17, 20. She stated this was considered a lifetime disorder. *Id.* at 21. Scheuneman testified that

---

[3] Kelley had been charged with two counts of burglary. The jury found Kelley not guilty of one count of burglary.

[4] The trial court originally sentenced Kelley to an aggregate of 28 to 56 years' incarceration. Kelley filed a post-sentence motion challenging the grading of two of the unlawful contact with minor convictions and the mandatory minimum applied to the involuntary deviate sexual intercourse conviction. The trial court granted the motion, and re-sentenced Kelley to an aggregate sentence of 18 to 50 years' incarceration.

hebephilia is not listed as a disorder in the DSM-V.[5] She stated that although a lot of paraphilic disorders are not listed in the DSM-V, individuals "still may suffer from" the disorders and the disorders "might be addressed in the clinical setting." *Id.* at 18. She stated that "there are so many that it would be exhaustive to print them all on the pages of the DSM." *Id.* at 18. She further testified that she uses the DSM for diagnosing a person in a clinical setting, but at the hearing she "was charged with . . . mak[ing] a conclusion that's consistent with the law and the way the law defines mental abnormality, personality disorder." *Id.* at 34. She pointed out that "hebephilia has been accepted in courts of law as significant because [they are] not just talking about urges and arousal patterns that we might treat in a clinical setting, but rather [they] are talking about behavior that follows those urges and arousing patterns." *Id.*

Scheuneman discussed the statutory factors for determining whether a person should be classified as an SVP. She noted, among other things, that: the offense included multiple victims with multiple sex acts; Kelley used coercion and manipulation and broke into homes to accomplish the offenses; the victims were between 13 and 15 years of age; and Kelley befriended the victims and engaged in conversation to identify emotional vulnerability. She acknowledged that Kelley did not have a prior history of sexual offenses, and

---

[5] Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed.

that he was 19 years of age at the time of the offenses. ***See id.*** at 8-24; Trial Court Opinion, at 17-19.

Thomas F. Haworth, Ph.D., L.P., a former member of the Sexual Offenders Assessment Board, testified that hebephilia is not a disorder recognized in the DSM-V and "there is enormous controversy within the scientific field around the validity of hebephilia being a paraphilic disorder." ***Id.*** at 52, 54. He testified that he believed Kelley's conduct was attributable to a previously undiagnosed condition of bipolar disorder and "histrionic personality traits," which both could be treated through pharmacotherapy and cognitive behavioral therapy. ***See id.*** at 48, 61; Trial Court Opinion, at 17-19. Dr. Haworth was able to interview Kelley and administer psychometric tests.

The trial court found that the Commonwealth had proven, by clear and convincing evidence, that Kelley was an SVP. Kelley timely appealed.

Kelley raises the following issues:

> I. Did the trial court err in denying [Kelley's] motion to sever, when one course of conduct against a victim differed substantially from the common scheme alleged by the Commonwealth for the remaining two victims?
>
> II. Did the trial court err in permitting the Commonwealth to present expert testimony when the testimony elicited was confusing to the finder of fact when applied to so many complainants with varying and unique allegations of misconduct by [Kelley]?
>
> III. Did the trial court err in determining that [Kelley] is a sexually violent predator?

Kelley's Br. at 7 (suggested answers and unnecessary capitalization omitted).

In his first issue, Kelley argues the trial court erred in denying his motion to sever. He argues that "the trial court should have severed at the very least M.M's charges from those of K.W. and S.B." *Id.* at 23. He points out there was no evidence at the severance hearing that M.M. and Kelley engaged in sexual behavior and he alleges he did not "groom" her or swear her to secrecy. Kelley maintains that M.M. was not a friend of K.W. and S.B. and did not observe any interactions between S.B. or K.W. and Kelley. He claims the events with M.M. were totally separate, with no common plan or scheme. He argues the evidence regarding K.W. and S.B.'s allegations served "only to present propensity to commit crimes of sexual misconduct." *Id.* at 24. He further argues the expert testimony would not have been permissible at M.M.'s trial because it would have been irrelevant. He maintains the evidence was most relevant to S.B.'s allegations. He maintains that by joining the trial of M.M.'s allegations with the trial for K.W. and S.B.'s allegations the trial court "muddied the waters of the facts and abused its discretion in the interest of judicial economy." *Id.* at 25.

We review a trial court's decision to deny a motion for severance for an abuse of discretion. **Commonwealth v. Dozzo**, 991 A.2d 898, 901 (Pa.Super. 2010) (quoting **Commonwealth v. Melendez–Rodriguez**, 856 A.2d 1278, 1282 (Pa.Super. 2004) (*en banc*)).

Pennsylvania Rule of Criminal Procedure 582 governs the joinder of separate informations for trial and provides:

- 9 -

(1) Offenses charged in separate indictments or informations may be tried together if:

(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) the offenses charged are based on the same act or transaction.

Pa.R.Crim.P. 582(A)(1).

Rule 583 governs severance of offenses and provides:

The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together.

Pa.R.Crim.P. 583. "Under Rule 583, the prejudice the defendant suffers due to the joinder must be greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime." *Dozzo*, 991 A.2d at 902 (quoting *Commonwealth v. Lauro*, 819 A.2d 100, 107 (Pa.Super. 2003)). Rather, the prejudice required under Rule 583 is "that which would occur if the evidence tended to convict [the] appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence." *Id.* (quoting *Lauro*, 819 A.2d at 107).

Reading Rules 582 and 583 together, the Pennsylvania Supreme Court determined that to decide whether to grant severance, courts must ask whether the evidence would be admissible in separate trials, the evidence is capable of separation by the jury, and the defendant will be unduly prejudiced

- 10 -

if the offenses are tried together. ***Commonwealth v. Ferguson***, 107 A.3d 206, 210-11 (Pa.Super. 2015) (quoting ***Commonwealth v. Collins***, 703 A.2d 418, 422 (Pa. 1997)) (brackets in original).

Evidence of other crimes or bad acts is not admissible to prove that the defendant acted "in conformity with those acts or to demonstrate a criminal propensity." ***Commonwealth v. Brown***, 52 A.3d 320, 325 (Pa.Super. 2012); Pa.R.Evid. 404(b). The evidence, however, may be admissible for another, proper purpose. ***Brown***, 52 A.3d at 325. One such proper purpose is to demonstrate a common plan, motive, scheme, or intent. ***Dozzo***, 991 A.2d at 902 (quoting ***Collins***, 703 A.2d at 422-23).

Here, the trial court analyzed the three factors and denied the motion to sever the charges:

> In looking at the first prong of the . . . test, this court will examine whether [Kelley's] conduct constituted a common scheme, plan or design, whether the evidence would support proving [Kelley's] intent, and whether the evidence would be admissible in separate trials. This court concludes that the Commonwealth has demonstrated the existence of a common scheme, plan or design evidenced in [Kelley's] conduct, and demonstrated that this evidence would support finding [Kelley's] criminal intent. Specifically, [Kelley's] conduct with regard to meeting his alleged minor victims at a local skating rink, adopting a "superhero" persona with his victims via referring to himself as "Superman" and claiming a desire to "help" them, sneaking into the alleged victims' residences by way of bedroom windows, acting without any knowledge or consent from the alleged victims' parents, and communicating with his victims while attempting to isolate them from family and support structures through both social media and written mail represent a common scheme, plan or design.

> Therefore, the Commonwealth has met the first prong of the . . . test.
>
> Regarding the second prong . . ., it is clear that the jury would be capable of avoiding confusion, and be able to separate the different allegations. "Where a trial concerns distinct criminal offenses that are distinguishable in time, space and the characters involved, a jury is capable of separating the evidence." **Com. v. Collins**, supra, 550 Pa. at 56. There are three separate alleged victims, and separate crimes connected with each alleged victim over a span of roughly nine months. The jury will, presumably, hear from each alleged victim, and will be able to evaluate their credibility regarding the individual offenses related to each of them. Therefore, the Commonwealth has met the second prong of the . . . test.
>
> Finally, under the third prong of the . . . test, while [Kelley] may suffer some prejudice as a result of the jury hearing allegations involving three alleged victims, regarding incidents spread over a nine month period, he will not be unduly prejudiced by consolidation. . . .
>
> Here, as discussed previously, the jury would not be confused by the evidence submitted during a consolidated trial, and the Commonwealth is not seeking to convict [Kelley] on the basis of any purported propensity to commit crimes. Therefore, the Commonwealth has passed the . . . test, and [Kelley's] motion to sever should properly be denied.

Trial Court Opinion, filed Oct. 7, 2020, at 4-5.

The trial court did not abuse its discretion. The evidence would have been admissible in separate trials, as it was admissible to establish a common plan, motive, scheme, or intent. Further, the jury could separate the evidence, avoiding the danger of confusion. In addition, Kelley would not be unduly prejudiced by the consolidation of offenses, as any prejudice would not be greater than other evidence linking him to the crime and the Commonwealth

was not seeking to convict Kelley based on a purported propensity to commit crimes.

Kelley next claims the court erred in allowing the Commonwealth to present expert testimony on grooming behavior. He argues the expert testimony "was dumped on defense counsel on the eve of trial," which limited Kelley's ability to contest it and hire an expert. Kelley's Br. at 25. He further claims the expert testimony focused on Kelley's "savior complex" and "'Superman' persona that was alleged to be predatory," which he alleges had nothing to do with M.M. *Id.* at 26. He argues "[t]he wide range of allegations made by each complainant rendered the expert testimony wholly confusing as to how it was relatable to any single victim." *Id.*

"[T]he admission of expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion." *Commonwealth v. Watson*, 945 A.2d 174, 176 (Pa.Super. 2008) (quoting *Commonwealth v. Brown*, 596 A.2d 840, 842 (Pa.Super. 1991)).

Section 5920 of the Judicial Code governs expert testimony in criminal proceedings. Where a defendant is charged with certain offenses, including sexual offenses, solicitation, corruption of minors, and unlawful contact with minors, Section 5920 permits a witness to be qualified as an expert if the witness has "specialized knowledge beyond that possessed by the average layperson" based on the witness's experience, specialized training, or education in "criminal justice, behavioral sciences or victim services issues,

- 13 -

related to sexual violence or domestic violence." 42 Pa.C.S.A. § 5920(b)(1). The witness may be so qualified if the proffered testimony will assist the trier of fact "in understanding the dynamics of sexual violence or domestic violence, victim responses to sexual violence or domestic violence and the impact of sexual violence or domestic violence on victims during and after being assaulted." *Id.*

The trial court cited Section 5920 and concluded that the General Assembly expressly authorized "the presentation of expert testimony in a case of the present type," and the court permitted "Dr. Shollenberger's testimony as proffered by the Commonwealth, subject to the restriction imposed in the order," that is, he was not permitted to testify regarding specifics of the instant case. 1925(a) Op. at 25. It further concluded that any prejudice to Kelley due to the timing of the notice, would have been "obviated by the passage of more than a year from the date of the notice until trial." *Id.*

Kelley's challenges to the admission of the testimony are meritless. Section 5920 permits the use of expert testimony about the dynamics of sexual violence in cases, such as the current case, where sex crimes are charged. Here, the expert provided testimony of the sort contemplated by the statute. Further, although the Commonwealth did not provide notice of its intent to use an expert until shortly before the initial date for trial, the trial was continued for more than a year following the retention of the expert, giving Kelley time to respond to the testimony.

In his final claim, Kelley contends that the evidence that he was an SVP did not rise to the level of clear and convincing evidence. He argues that his expert, Dr. Haworth, "presented compelling testimony that due to the age of Mr. Kelley and his specific mental health conditions needing valid and accessible treatment regimens, that it is hard to say the Commonwealth met its burden of proof by a clear and convincing standard." Kelley's Br. at 26-27. Kelley argues that Dr. Haworth had more experience as an evaluator and more education than Ms. Scheuneman and had conducted an in-person examination of Kelley. He argues that Dr. Haworth "did not try to categorize [] Kelley with a label that does not have general acceptance in the greater scientific community." *Id.* at 27. Kelley further claims that he "is an immature man-child who has delusion of grandeur amplified by bipolar disorder, not that he is an incurable sociopath who will always be a sexually violent predator." *Id.* He points out he was 19 at the time of the crimes and claims that when K.W. asked him to stop, he did.

We review an SVP designation to determine whether the Commonwealth presented clear and convincing evidence that the defendant meets the statutory definition of an SVP. ***Commonwealth v. Hollingshead***, 111 A.3d 186, 189 (Pa.Super. 2015). "As with any sufficiency of the evidence claim, we view all evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth." *Id.* (quoting ***Commonwealth v. Baker***, 24 A.3d 1006, 1033 (Pa.Super. 2011)).

To be classified as an SVP, the Commonwealth must prove by clear and convincing evidence that the defendant has "a mental abnormality or personality disorder that makes [him] likely to engage in predatory sexually violent offenses." 42 Pa.C.S.A. § 9799.12 (**"Sexually violent predator"**). The statute defines "mental abnormality" as "[a] congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." *Id.* (**"Mental abnormality"**) The defendant's conduct must also have been "predatory," which the statute defines as "[a]n act directed at a stranger or at a person with whom a relationship has been instituted, established, maintained, or promoted, in whole or in part, in order to facilitate or support victimization." *Id.* (**"Predatory"**); *Commonwealth v. Stephens*, 74 A.3d 1034, 1038 (Pa.Super. 2013).

To determine whether the defendant meets the above definition, the SOAB evaluates the following factors, "which are mandatory and are designed as criteria by which the likelihood of reoffense may be gauged":

(1) Facts of the current offense, including:

(i) Whether the offense involved multiple victims.

(ii) Whether the individual exceeded the means necessary to achieve the offense.

(iii) The nature of the sexual contact with the victim.

(iv) Relationship of the individual to the victim.

(v) Age of the victim.

(vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime.

(vii) The mental capacity of the victim.

(2) Prior offense history, including:

(i) The individual's prior criminal record.

(ii) Whether the individual completed any prior sentences.

(iii) Whether the individual participated in available programs for sexual offenders.

(3) Characteristics of the individual, including:

(i) Age.

(ii) Use of illegal drugs.

(iii) Any mental illness, mental disability or mental abnormality.

(iv) Behavioral characteristics that contribute to the individual's conduct.

(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense.

42 Pa.C.S.A. § 9799.24(b); *Commonwealth v. Morgan*, 16 A.3d 1165, 1168-69 (Pa.Super. 2011). We have found that "a trial court may conclude, based upon the expert testimony and facts in a given case, that a hebephilia diagnosis is sufficient to find a defendant has a mental abnormality." *Hollingshead*, 111 A.3d at 193. We concluded that "the debate about surrounding hebephilia diagnoses, and their use in SVP proceedings, goes to the weight of the expert witness' testimony." *Id.*

The trial court found the Commonwealth proved by clear and convincing evidence that Kelley was an SVP:

> In the present case, an independent review of the factors to be considered in a sexually violent predator determination, the opinions of the experts, and the caselaw concerning hebephilia led th[e trial] court to concur with the factor-oriented analysis of the Commonwealth's expert, including her diagnosis, and to find that the Commonwealth had met its burden of proving that [Kelley] met the criteria for a sexually violent predator by clear and convincing evidence.

1925(a) Op. at 27-28.

We conclude the Commonwealth presented sufficient evidence to support the court's conclusion Kelley was an SVP. Scheuneman testified to her analysis of the factors and concluded he suffered from a mental disorder and his actions were predatory. This testimony, which the court credited, supports its conclusion that Kelley was an SVP. Any controversy regarding hebephilia diagnoses in SVP proceedings goes to the weight, not the sufficiency, of the testimony. *Hollingshead*, 111 A.3d at 193.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/24/2023

- 18 -